# EXHIBIT A

---

## COST LOAN AND SECURITY AGREEMENT

This **COST LOAN AND SECURITY AGREEMENT** is entered into at San Francisco, California as of March 7, 2007, by and between **Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L.** (*"Borrower"*), having a principal place of business at 221 East Osceola Street, Stuart, Florida 34994 and **LawFinance Group, Inc.**, a California corporation, having a principal place of business at 1700 Montgomery Street, Suite 249, San Francisco, CA 94111 (*"Lender"*).

### RECITALS

A.      Borrower has requested that Lender provide financial accommodations to Borrower as more fully set forth herein.

B.      The Obligations will be guaranteed by Guarantors.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

### AGREEMENT

1.      **Certain Definitions and Index to Definitions.**

1.1      **Accounting Terms.**  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with generally accepted accounting practices in the industry consistently applied.

1.2      **Definitions.**  All other terms contained in this Agreement that are not specifically defined herein shall have the meanings provided in the UCC to the extent the same are used herein.  All references herein to the singular or plural shall also mean the plural or the singular, respectively.  As used herein, the following terms shall have the following meanings:

1.2.1      "Accounting Period" – a calendar month.

1.2.2      "Advance" – See Section 2.1.1.

1.2.3      "Agreement" – This Cost Loan and Security Agreement, together with all exhibits and schedules hereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, or replaced.

1.2.4      "Availability" – a sum of up to 90% of Eligible Case Costs, but not in excess of the Maximum Loan Amount.

1.2.5      "Banking Day" – A day on which a commercial bank is open for business in the Chosen State.

1.2.6      "Borrower" – See Preamble.

1.2.7      "Business Day" – Any day which is not a Saturday, Sunday, or other day on which national banks are authorized or required to be closed.

1.2.8      "Case" – a lawsuit filed in a court of competent jurisdiction or a dispute that has been submitted to court, an arbitrator(s), or a designated arbitration services organization to commence binding arbitration by Borrower on behalf of a client in connection with the client's claim.

EXHIBIT A
PAGE 4

**1.2.9**   "Case Costs" are costs advanced by Borrower on Eligible Cases for which Borrower is legally entitled under a fee agreement to be reimbursed out of the first Proceeds of a Case and any interest payable to Borrower thereon.

**1.2.10**   "Case Lost" – is a Case in which: (a) a judgment has been entered in the trial court or award has been rendered by an arbitrator under which client and Borrower will receive either no recovery or insufficient recovery to enable Borrower to recoup all of Borrower's costs advanced for the Case and any interest payable to Borrower thereon;           (b) the Borrower has withdrawn or been replaced or which is still pending but Borrower is no longer actively pursuing the client's Case; or (c) that has been dismissed by a court or abandoned by Borrower.

**1.2.11**   "Case Won" – is a Case from which proceeds are obtained from any judgment, award, compromise, settlement or other recovery payable to a client or Borrower as a result of the disposition (in whole or in part) of a claim or related Case and proceeds are payable to Borrower and sufficient in amount to enable Borrower to recoup all of Borrower's costs advanced for the Case and any interest payable to Borrower thereon.

**1.2.12**   "Chosen State" – California.

**1.2.13**   "Closed Case and Cash Receipt Report" – a report prepared by Borrower listing and certifying every Case Won and every Case Lost and all fees and costs expended and received or receivable, as of the last day of the month.

**1.2.14**   "Closing" – The date on which the Initial Advance Amount is funded to Borrower and such date shall be no more than three (3) business days after the mutual execution of this Agreement.

**1.2.15**   "Collateral" – All Borrower's present and future Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, including all of Borrower's rights to attorneys fees and costs generated from all legal activity of Borrower, including without limitation, attorneys fees and costs generated from the Cases, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, and the proceeds thereof.

**1.2.16**   "Default Interest Rate" – The Interest Rate plus 5% per annum.

**1.2.17**   "Eligible Case" – A case for which Borrower has signed fee agreements and/or binding referral agreements, that have been pending for one hundred eighty-one days (181 days) and which Lender, in its sole discretion, deems eligible for advance.

**1.2.18**   "Eligible Case Costs" – are Case Costs in an Eligible Case that: (i) in any one Eligible Case represents no more than 5% of the aggregate Eligible Case Costs in all of Borrower's Eligible Cases; and (ii) that represents no more than 10% of the estimated settlement value of that particular Eligible Case. In instances where any one Eligible Case represents more than 5% of the aggregate Eligible Case Costs in all of Borrower's Eligible Cases or if the Eligible Case represents more than 10% of the estimated settlement value of that particular Eligible Case, Lender shall review that particular Eligible Case, on an individual basis, and may exempt the Eligible Case, solely in Lender's discretion, from requirements (i) and (ii) of this Section. The Eligible Cases that Lender has exempted from requirements (i) and (ii) of this Section as of the Closing are listed on Exhibit 1.2.22 attached hereto.

**1.2.19**   "Eligible Case Report" – a report prepared by Borrower and delivered to Lender or made available to Lender via electronic media, which lists and certifies every Eligible Case as of the last day of the prior month, Borrower's statement of estimated value, costs advanced to date and estimated trial and settlement date of each case.

**1.2.20**   "Event of Default" – See Section 11 hereof.



EXHIBIT A
PAGE 5

1.2.21   "**Guarantor**" – All individuals and entities now or hereafter guaranteeing the Obligations, including but not limited to Willie E. Gary and Lorenzo Williams.

1.2.22   "**Index**" – Shall be "Three-Month LIBOR" which for any period, shall equal the offered rate for dollar deposits of one month set by the British Bankers' Association as found on page BBAM of the official British Bankers' Association LIBOR findings, as reported as of 11:00 a.m. (London time) on the applicable determination date.  LIBOR shall be determined for each calendar quarter based upon LIBOR prevailing as of the first Business Day of such quarter and shall be calculated to the fourth decimal point.

1.2.23   "**Initial Advance**"—See Section 2.1.2.

1.2.24   "**Interest Rate**" – The Index plus 13.0% per annum.  The applicable Interest Rate will be adjusted on the first day of each calendar quarter based on the Index as of such date.

1.2.25   "**Key Employee(s)**" – Willie E. Gary and Lorenzo Williams.

1.2.26   "**Lender**" – See Preamble.

1.2.27   "**Loan Balance**" – The outstanding balance of all advances and other amounts due hereunder.

1.2.28   "**Loan Documents**" - This Agreement, together with any other documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.2.29   "**Maximum Loan Amount**" – $13,000,000.00.

1.2.30   "**Maturity Date**" – the date six months after the last day of the Revolving Loan Period.

1.2.31   "**May 2005 Loan Agreement**" -- See Section 2.1.2.

1.2.32   "**Northern Trust**" – means Northern Trust Bank of Florida, N.A.

1.2.33   "**Northern Trust Maximum Amount**" - $5,000,000.00.

1.2.34   "**Northern Trust Loan**" – the credit facility(ies) by Northern Trust to the Borrower with a maximum aggregate outstanding amount not exceeding the Northern Trust Maximum Amount.

1.2.35   "**Northern Trust Subordination Agreement**" – See Section 9.11.

1.2.36   "**Obligations**" – All present and future obligations owing by Borrower to Lender hereunder, whether arising before, during or after the commencement of any Bankruptcy Case in which Borrower is a debtor.

1.2.37   "**Obligor**" – Borrower or any Guarantor.

1.2.38   "**Permitted Liens**" – the security interest of Northern Trust in the Collateral to secure the Northern Trust Loan.

1.2.39   "**Proceeds**" – refers to cash, negotiable instruments, contract rights, annuities, and any other rights to payment of cash and transfer of things of value or other property.

1.2.40   "**Revolving Loan Period**" – See Section 2.1.1.

EXHIBIT ___A___
PAGE ___6___

**1.2.41** "**Subordinating Creditor**" -- Any creditor of the Borrower which has executed a Subordination Agreement.

**1.2.42** "**Subordination Agreement**" - A subordination agreement in form and substance acceptable to Lender whereby Subordinating Creditor subordinates, in favor of Lender, obligations owed to it by Borrower.

**1.2.43** "**Term Loan Period**" -- See Section 2.1.1.

**1.2.44** "**UCC**" - The Uniform Commercial Code in effect in the Chosen State at the date on which a determination thereunder is to be made.

**2.**    **Loan.**

**2.1.1**    **Term.** The total term of the loan shall consist of the period during which the loan is a revolving loan (the "**Revolving Loan Period**") and the subsequent period during which the loan is a term loan (the "**Term Loan Period**").

> **2.1.1.1**    **Revolving Loan Period.** Subject to the terms and conditions of this Agreement, the Revolving Loan Period shall be the first twelve months following the Closing, unless the Revolving Loan Period is extended for an additional two years (making a Revolving Loan Period of three years) in accordance with Section 2.1.4.

> **2.1.1.2**    **Term Loan Period.** Regardless of whether Borrower elects to extend the Revolving Loan Period or not, and subject to the terms and conditions of this Agreement, the Term Loan Period shall be the six month period following the Revolving Loan Period during which the loan shall be a term loan.

> **2.1.1.3**    **Total Term of Loan.** The total term of the loan (consisting of the Revolving Loan Period plus the Term Loan Period) shall be eighteen months from the Closing, unless Borrower extends the Revolving Loan Period for an additional two years, in accordance with Section 2.1.4, in which case the total term of the loan shall be 42 months (3 ½ years) from the Closing.

**2.1.2**    **Advances.** During the Revolving Loan Period, Lender, shall, from time to time, at the request of Borrower, make advances ("**Advances**") to Borrower according to the procedure detailed in Exhibit 2.1.1, so long as, before and after such Advance, the Obligations do not exceed the Maximum Loan Amount.

**2.1.3**    Upon the execution and delivery of this Agreement by the parties and the execution of the Borrowing Base Certificate and Closing Statement attached hereto as Exhibit 2.1, Lender shall lend to Borrower at the Closing an initial Advance (the "**Initial Advance**") equal to the amount required to: (i) repay the Loan Balance under the Loan and Security Agreement between Borrower and Lender, dated May 16, 2005, as amended (the "**May 2005 Loan Agreement**"); (ii) pay all accrued and unpaid interest through the date of the Closing and terminate the May 2005 Loan Agreement; (iii) provide funding for Eligible Case Costs as specified at the time of the Initial Advance, upon Lender's receipt of Borrower's report indicating the Eligible Case name and Case number and amount of Case Costs advanced for that particular Case; (iv) pay the Loan Fee; and (v) pay any other fees and costs that are due and payable under this Agreement..

**2.1.4**    **Extension of Loan.** Provided no Event of Default has occurred and is continuing, Borrower shall have the option to extend the Revolving Loan Period for an additional two years. Borrower shall provide written notice to Lender of Borrower's intention to extend the Revolving Loan Period for two years not later than the date that is 90 days prior to the end of the Revolving Loan Period.

EXHIBIT _A_

PAGE ___7___

2.2     Repayment.

    2.2.1     In addition to all other payments required hereunder, all Obligations shall be due and payable on the Maturity Date.

    2.2.2     Mandatory Payments.

        2.2.2.1     **Eligible Case Costs:** The following shall apply during the Revolving Loan Period only: Not later than ten days following the end of any calendar month in which Borrower receives any Eligible Case Costs in any of the Borrower's Cases, Borrower shall remit as a payment to Lender the lesser of (a) the full amount of Eligible Case Costs recovered by the Borrower; and (b) the outstanding Loan Balance. In the event of a Case Lost, not later than ten days following the end of any calendar month in which the Case Lost occurred, Borrower shall notify Lender of such Case Lost and remit as a payment to Lender an amount equal to all Case Costs advanced and accrued interest for that Case Lost. Lender shall apply such payments in accordance with Section 3.2. Upon notification by Borrower of a Case Lost, Lender may, in its sole discretion, extend a payment plan over a period of 3 months, and in 3 equal installments, for the Case Costs and accrued interest for that Case Lost.

        2.2.2.2     **Availability.** Throughout the term of this Agreement, Lender shall recalculate the Availability under the borrowing base. If the Obligations exceed the Maximum Loan Amount, Borrower shall make repayments, within 15 days of receipt of notice thereof, such that the outstanding Obligations are less than the Maximum Loan Amount.

            2.2.2.2.1     Lender shall have the right, in its sole discretion, to establish and modify the Availability from time to time. A reduction in Availability would be based on a reduction in the general creditworthiness and/or diversity of Borrower's Cases, the overall creditworthiness of the Guarantors, and/or the creditworthiness of Borrower, as determined in the sole discretion of Lender.

    2.2.3     **Term Loan Period.** The Term Loan Period (during which the loan shall be a term loan) shall begin on the day following the end of the Revolving Loan Period (whether extended or not) and continue until the Maturity Date. During the Term Loan Period, Borrower shall pay interest monthly on the Loan Balance, in arrears. In addition, during the Term Loan Period, upon Borrower's receipt of any Eligible Case Costs in any of the Borrower's Cases, Borrower shall immediately remit as a payment to Lender the lesser of (a) an amount equal to 150% of Eligible Case Costs recovered by the Borrower; and (b) the outstanding Loan Balance. Lender shall apply such payments in accordance with Section 3.2. There shall be a final balloon payment equal to the amount of the Obligations due and payable on the Maturity Date. For avoidance of doubt, Lender shall make no Advances during the Term Loan Period.

    2.3     **Optional Case Tracking of Interest.** If Borrower and client agree that client will pay Borrower interest on the client's Case Costs and Borrower represents to Lender that the agreement meets the legal and ethical requirements in the applicable State, Lender may offer to assist Borrower in tracking interest accruing on those Case Costs as reported to Lender by Borrower. If Borrower elects such services from Lender, the terms and conditions as set forth in Exhibit 2.3 shall apply.

3.     **Payments by Borrower.**

    3.1     **Place and Method of Payments.** All payments hereunder shall be made by Borrower to Lender by wire transfer or as Borrower and Lender may otherwise agree in writing. Wire transfers received before 2:00 p.m. Pacific Time shall be credited on the day received, otherwise the wire transfer shall be credited for the following Business Day.

    3.2     **Application of Payments.** Payments received by Lender under this Agreement shall be applied in the following order of priority, unless Lender in its sole discretion determines otherwise: (i) reduction of the Loan Balance that relates to the particular Eligible Case Costs for which the mandatory payment is made under Section 2.2.2.1 or 2.2.3; (ii) accrued and unpaid interest on the Loan Balance that relates to the particular Eligible Case

5

EXHIBIT A
PAGE 3

Costs for which the mandatory payment is made under Section 2.2.2.1 or 2.2.3; (iii) fees and chargeable costs, including expenses, taxes and reimbursements required under this Agreement; (iv) any remaining accrued and unpaid interest on the Loan Balance; and (v) any other Obligation under this Agreement.

    3.3    **ACH Debits.**  In order to satisfy any of the Obligations, Lender is hereby authorized by Borrower to initiate electronic debit entries through the ACH or other electronic payment system to any account, other than attorney-client trust accounts, maintained by Borrower. At the Lender's request, Borrower shall execute and deliver to Lender an authorization agreement for ACH debits. Set forth in Exhibit 3.3 are all current bank accounts of Borrower, including institution name, address, account number and brief description of the purpose of such account.

    4.    <u>Interest and Fees.</u>

    4.1    <u>Interest.</u>

    4.1.1    <u>Basic Interest</u>. Subject to Section 4.1.4 hereof, interest on all Obligations shall be payable monthly, in arrears, shall be computed at the Interest Rate, and shall be due and payable on the first day of each month following the accrual thereof.

    4.1.2    <u>Late Payment of Interest</u>.

    4.1.2.1    If the Borrower fails to pay interest when due each month, there shall be a ten day grace period.

    4.1.2.2    If the interest payment is received on or before the 10th day of the month in which it is due, interest will not accrue on the late payment.

    4.1.2.3    If the interest payment is received after the 10th day of the month in which it is due, but on or before the 15th day of such month, the amount of the late interest payment will be added to the Loan Balance as of the 1st day of that month and shall accrue interest at the Interest Rate until payment is received.

    4.1.2.4    If an interest payment is not received on or before the 15th day of the month in which it is due, the amount of the missed interest payment will be added to the Loan Balance as of the 1st day of that month and shall accrue interest at the Default Interest Rate. Additionally, if the interest payment is not received on or before the 15th day of the month in which it is due, an Event of Default shall have occurred and Lender may exercise all remedies available to it.

    4.1.3    <u>Default Interest</u>.

    4.1.3.1    Immediately upon the occurrence of an Event of Default, interest shall accrue at the Default Interest Rate.

    4.1.3.2    Lender's failure to assess interest at the Default Interest Rate shall not be deemed a waiver by Lender to charge such Default Interest Rate.

    4.1.4    <u>Calculation of Interest</u>. All interest charged hereunder shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed and shall begin to accrue on the date of Closing.

    4.1.5    <u>Fees</u>. Exhibit 4.1.5 sets forth Lender's loan fee schedule.

    5.    <u>Grant of Security Interest and Guaranty</u>. To secure the performance of the Obligations, Borrower hereby grants to the Lender a first-priority security interest (except that it is junior only to the Permitted

6

EXHIBIT _A_
PAGE _9_

Liens) in the Collateral, and all proceeds and products thereof. In addition, each of the Guarantors shall enter into the Guaranty attached as Exhibit 5.

6.  **Authorization to File Financing Statements.**

6.1  The Borrower irrevocably authorizes the Lender to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that:

6.1.1  Indicate the Collateral as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

6.1.2  Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including: (i) whether the Borrower is an organization, the type of organization, and any organization identification number issued to the Borrower; and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates;

6.1.3  Contain a notification that the Borrower has granted a negative pledge to the Lender, and that any subsequent lienor may be tortiously interfering with Lender's rights;

6.1.4  Advise third parties that any notification of Borrower's account debtors will interfere with Lender's collection rights;

6.2  The Borrower agrees to furnish any of the foregoing information to the Lender promptly upon request;

6.3  The Borrower ratifies its authorization for the Lender to have filed any like initial financing statements or amendments thereto if filed prior to the date hereof; and

6.4  The Lender may add any supplemental language to any such financing statement as Lender may determine to be necessary or helpful in acquiring or preserving rights against third parties.

7.  **Collection and Administration of Accounts.**

7.1  **Lender's Powers.** Borrower hereby authorizes Lender, at Borrower's sole expense, to exercise at any time in Lender's discretion all or any of the following powers, which powers are irrevocable until all of the Obligations have been paid in full:

7.1.1  With the exception of checks for deposit into attorney client trust accounts, receive, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof;

7.1.2  Pay any sums necessary to discharge any lien or encumbrance that is senior to Lender's security interest in the Collateral, which sums shall be included as Obligations hereunder; and

7.1.3  Send requests (which may identify the sender by a pseudonym) for verification of any Accounts directly to the account debtor or any bailee of the Collateral.

7.2  **Release.** Borrower hereby releases and exculpates Lender, its officers, employees, agents, designees, attorneys, and accountants from any liability arising from any acts under this Agreement or in furtherance thereof, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct. In no event shall Lender have any liability to Borrower for lost profits or other special or consequential damages.

7

EXHIBIT A
PAGE 12

8. **Representations and Warranties by Borrower.**

8.1     Borrower is now and at all times that money is due Lender shall be duly organized, validly existing and in good standing under the laws of its state of formation and duly licensed and qualified to practice law, with power to carry on its law business and collect attorneys fees as now being conducted, and is and at all times that money is due Lender shall be duly qualified to do business and practice law and is in good standing as a lawyer and foreign company in each jurisdiction where the nature of its business of the practice of law, or otherwise requires, such qualification and license.

8.2     Each attorney who is a member of, employed by or associated with Borrower is and at all times that money is due Lender shall be duly qualified to practice law and in good standing in every jurisdiction in which Borrower currently conducts business or conducts business in the future.

8.3     The execution and delivery by Borrower of the Loan Documents or any of the other transaction documents to which it is a party, and the performance by Borrower of its obligations thereunder, have been duly authorized by all necessary action and do not and will not contravene or conflict with any provision of law or Borrower's organizational documents or any material agreement by which it is bound.

8.4     The Loan Documents and all other transaction documents have been duly executed and delivered by Borrower and such other party as required by the documents.

8.5     The Loan Documents and all other transaction documents and instruments required to be executed and delivered by Borrower in connection with this Agreement or the financing contemplated hereby, when executed and delivered, will constitute the duly authorized, legal, valid and binding obligations of Borrower and the Guarantors, as applicable, and will be enforceable against Borrower and any other parties to such agreements (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally or the availability of equitable remedies).

8.6     Borrower has all rights in and to the Collateral, free and clear of liens and encumbrances, except for liens in favor of Lender and the Permitted Liens.

8.7     Upon the filing of all appropriate UCC financing statements the security interest granted herein shall constitute a valid, first priority preferred and perfected security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof, *provided, however,* that to the extent that Northern Trust Bank may have a Permitted Lien that is senior to Lender's security interest in the Collateral, Northern Trust Bank shall have subordinated to Lender its interest in that portion of the Collateral that consists of Eligible Case Costs.

8.8     Neither Borrower nor any of the Guarantor(s) has any offsets, defenses or counterclaims with respect to the amounts owing to Lender hereunder.

8.9     There is no agreement to which Borrower is a party or by which it may be bound that requires the subordination in right of payment of any of the Obligations to any other obligation of Borrower, except as may be permitted under the Northern Trust Subordination Agreement.

8.10    Neither Borrower nor Guarantor have any indebtedness to any other person except for indebtedness (i) listed in the financial statement of Borrower and Guarantor as attached hereto as Exhibit 8.10 or as otherwise listed in Exhibit 8.10 or (ii) constituting trade payables arising in the ordinary course of business not aged more than 90 days.

8.11    All information furnished by Borrower to Lender in connection with the Loan Documents is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the information furnished, in light of the circumstances under which furnished, not misleading.

8

EXHIBIT _A_
PAGE _11_

8.12    There are no actions or proceedings pending by or against Borrower before any court or administrative agency and Borrower does not have knowledge or belief of any pending, threatened, or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving Borrower or any Guarantor of the Obligations, except for ongoing collection matters in which Borrower is the plaintiff and as disclosed in the Litigation Schedule attached as Exhibit 8.12.

8.13    All financial statements relating to Borrower that have been delivered by Borrower to Lender have been prepared in accordance with generally accepted accounting practices in the industry consistently applied and fairly present Borrower's financial condition as of the date thereof and Borrower's results of operations for the period then ended. There has not been a material adverse change in the financial condition of Borrower since the date of the latest financial statements submitted to Lender on or before the date hereof.

8.14    As of the Closing, Borrower shall provide Lender with a listing of all of Borrower's Cases and Case Costs current as of the Closing. Such list shall be complete and accurate as of the date thereof.

9.      **Affirmative Covenants.**  Until full payment of the Obligations and termination of this Agreement, Borrower shall:

9.1     Furnish to Lender, in form and substance satisfactory to Lender, the reports and documents specified in Exhibit 9.1.

9.2     **Enforcement of Judgments.**  Reimburse Lender for all costs and expenses, including attorneys' fees, which Lender incurs in enforcing any judgment rendered in connection with this Agreement. This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

9.3     Taxes and Expenses Regarding Borrower's Assets.

9.3.1   Make timely payment or deposit of all taxes, assessments or contributions required of Borrower. If Borrower fails to make any such payment or deposit or furnish proof of such payment immediately upon Lender's request, Lender may, in its sole discretion, after providing five (5) days notice (but only if no further penalties accrue or defaults occur or shall occur during such five (5) day notice period) to Borrower:

9.3.1.1   make payment of the same or any part thereof; or

9.3.1.2   set up such reserves against the Obligations as Lender deems necessary to satisfy the liability therefore, or both.

9.3.2   Lender may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency. Any payment made by Lender shall constitute neither:

9.3.2.1   an agreement by Lender to make similar payments in the future; nor

9.3.2.2   A waiver by Lender of any default under the Loan Documents. Lender need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

9.4     **Change in Name.**  Give Lender written notice immediately upon forming an intention to change its name, state of organization or form of business organization.

9.5     Maintenance of Insurance.

9.5.1   The Borrower will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general

9

EXHIBIT _4_
PAGE _12_

practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender.  In addition, all such insurance shall be payable to the Lender under a "lender loss payable endorsement."  Without limiting the foregoing, the Borrower will:

      9.5.1.1    Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

      9.5.1.2    Maintain all such workers' compensation or similar insurance as may be required by law;

      9.5.1.3    Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Borrower; and business interruption insurance;

      9.5.1.4    Maintain a life insurance policy upon the life of Willie Gary in the amount of $12,000,000.00 and upon the life of Lorenzo Williams in the amount of $1,000,000.00, name Lender as beneficiary of such policies and assign such policies to Lender.

      9.5.2    Maintain a professional liability policy in an amount not less than $10,000,000.00 by no later than 90 days after the Closing.

      9.5.3    In the event that Borrower fails to maintain any such insurance, Lender may obtain such insurance at Borrower's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance.

      9.6    **Access to Electronic Information.**  Borrower hereby permits Lender at any time to access electronically information concerning any accounts maintained by Borrower with any bank or other financial institution so long as such access is in furtherance of, or to monitor compliance with, the terms of this Agreement, and Borrower shall provide Lender with all necessary access codes, passwords and the like to carry out the provisions hereof.

      9.7    **Accounting System.**  Borrower shall maintain and utilize a computer-based accounting system and case management system of a type and in a manner approved by Lender.

      9.8    **Change in Bank Accounts.**  Borrower shall give Lender written notice (whether by overnight mail, facsimile or electronic transmission) immediately upon closing or opening an account with a bank and such notice shall include the name and address of the bank, the account number and a brief description of the purpose of the account.

      9.9    **Maintain the Value of the Collateral.**  Borrower shall maintain a value of Borrower's anticipated fees, net of any referral or fee sharing arrangements, from the Eligible Cases, as calculated by Lender, of at least five times the Eligible Case Costs.

      9.10    **Compliance with Other Agreements.**  Borrower shall timely perform all material obligations imposed upon it under any other agreements by which Borrower is bound and no event of default under such other agreements shall occur due to any act or omission on the part of Borrower.

F:\FirmFinance\FirmFinance Loans\FirmFinance Pending Loans\Gary Williams #2 ($13 mil cost loan)\$13 MM Cost Term Loan and Security Agreement--(Gary Williams February 2007) version 8--3.16.07.DOC

EXHIBIT   A
PAGE   13

9.11    **Subordination Agreement with Northern Trust.** Lender and Northern Trust shall have executed a Subordination Agreement in form and substance satisfactory to Lender (the "**Northern Trust Subordination Agreement**"). The Northern Trust Subordination Agreement shall provide for the following, among other things:

9.11.1    Lender shall recognize and acknowledge that Northern Trust's security interest in the Collateral is first and primary, and Lender's security interest in the Collateral is second and subordinate to Northern Trust, subject to the following limitations:

9.11.2    To the extent that the obligations of the Borrower to Northern Trust secured by the Collateral ever exceeds the Northern Trust Maximum Amount, Northern Trust's security interest in the Collateral securing any amount in excess of the Northern Trust Maximum Amount shall be in all respects subordinate to Lender's security interest in the Collateral.

9.11.3    To the extent that Northern Trust's security interest in the Collateral consists of Case Costs, Northern Trust shall agree that its security interest in such Case Costs shall be in all respects subordinate to Lender's security interest in the Collateral.

10.    **Negative Covenants.** Borrower will not:

10.1    **Negative Pledge.** Hereafter grant any lien upon the Collateral except in favor of Lender.

10.2    **Mergers, etc.** Enter into any acquisition, merger, consolidation, reorganization, or recapitalization, or reclassify its capital stock, or liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, assign, lease, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its business, property, or assets, whether now owned or hereafter acquired, or acquire by purchase or otherwise all or substantially all of the properties, assets, stock, or other evidence of beneficial ownership of any entity.

10.3    **Transfer of Assets.** Enter into any transaction for an amount greater than $25,000.00, not in the ordinary and usual course of Borrower's business, including the sale, lease, or other disposition of, moving, relocation, or transfer, whether by sale or otherwise, of any of Borrower's properties or assets (other than sales of Inventory to buyers in the ordinary course of Borrower's business as currently conducted).

10.4    **Change of Name.** Change Borrower's name, Federal Employer Identification Number, business structure, or identity, or add any new fictitious name.

10.5    **Suspension of Business.** Suspend or go out of a substantial portion of its business.

10.6    **Change in Principal Place of Business.** Change its principal place of business or the location at which Borrower maintains its business records without written notification to Lender.

11.    **Events of Default.** Each of the following events or conditions shall constitute an "Event of Default":

11.1    Borrower fails to meet any payment obligation within 15 days of its due date;

11.2    Unless otherwise stated herein, Borrower fails to cure the breach of any Obligation other than a payment obligation within three (3) days after notice thereof is sent by Lender to Borrower;

11.3    Borrower fails to maintain insurance as required by Section 9.5, and Borrower fails to cure such breach within five days of notice thereof;

11.4    Borrower fails to provide timely informational reports as required by Section 9.1, and Borrower fails to cure such breach within five days of notice thereof;

11

EXHIBIT A
PAGE 14

11.5    Borrower fails to permit the Lender's employees or agents perform audits as permitted under Section 4.1, and Borrower fails to cure such breach within five days of notice thereof;

11.6    Borrower is in default with respect to any present or future agreement with Lender;

11.7    An order for relief is entered against any Obligor by any United States Bankruptcy Court; or any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto); or any Obligor makes an assignment for the benefit of creditors; or any Obligor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets, or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of any Obligor; or any Obligor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application, or otherwise) against any Obligor; or any judgment, writ, warrant of attachment, execution, or similar process shall be issued or levied against a substantial portion of the property of any Obligor;

11.8    An adverse change occurs with respect to the financial condition or operations of Borrower which results in a material impairment of the prospect of repayment of the Obligations;

11.9    Any Guarantor defaults in the performance of its obligations to Lender or shall notify Lender of its intention to rescind, modify, terminate or revoke the its guaranty or it shall cease to be in full force and effect for any reason whatever;

11.10    Any Subordinating Creditor fails to perform or observe any of such Subordinating Creditor's obligations under any Subordination Agreement, or notifies Lender of the Subordinating Creditor's intention to rescind, modify, terminate or revoke the Subordination Agreement with respect to future transactions, or the Subordination Agreement ceases to be in full force and effect for any reason whatsoever;

11.11    Any of the Key Employees fails to devote one hundred (100%) percent of their efforts in furtherance of the business affairs of Borrower for any one month, ceases to provide services to the Borrower in the capacity and in the manner that such Key Employee provided services as of the date of this Agreement, or ceases to be authorized and fails to be licensed to practice law in any state in which such license is required for the conduct of Borrower's business, as currently or hereafter is being conducted.

11.12    Any provision of this Agreement or any of the Loan Documents ceases, for any reason, to be valid and binding on Borrower.

11.13    Borrower or any Guarantor is in default with respect to any present or future agreement or obligation pursuant to the Northern Trust Loan.

12.    Remedies.

12.1    Upon the occurrence of any Event of Default all Obligations shall accrue interest at the Default Interest Rate and Lender may:

12.1.1    Declare this Agreement and all of Lender's obligations hereunder terminated;

12.1.2    Declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower;

12.1.3    Take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon any Collateral; or

12.2    BORROWER WAIVES ANY REQUIREMENT THAT LENDER INFORM BORROWER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF BORROWER'S

EXHIBIT A PAGE 15

OBLIGATIONS HEREUNDER.  FURTHER, LENDER'S FAILURE TO CHARGE OR ACCRUE
INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A
WAIVER BY LENDER OF ITS CLAIM THERETO.

13.     **Standards for Exercising Remedies.**  To the extent that applicable law imposes duties on the
Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is
not commercially unreasonable for the Lender:

13.1    to fail to exercise collection remedies against account debtors or other persons obligated on
Collateral or to remove liens or encumbrances on or any adverse claims against Collateral;

13.2    to exercise collection remedies against account debtors and other persons obligated on Collateral
directly or through the use of attorneys, collection agencies and other collection specialists;

13.3    to advertise dispositions of Collateral through publications or media of general circulation,
whether or not the Collateral is of a specialized nature;

13.4    to hire one or more professional auctioneers or attorneys to assist in the disposition of Collateral,
whether or not the collateral is of a specialized nature;

13.5    to dispose of Collateral by using Internet sites that provide for the auction of assets of the types
included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of
assets;

13.6    to dispose of assets in wholesale rather than retail markets;

13.7    to disclaim all disposition warranties;

13.8    to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection
or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of
Collateral; or

13.9    Borrower acknowledges that the purpose of this Section 13 is to provide non-exhaustive
indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's
exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed
commercially unreasonable solely on account of not being indicated in this Section.  Without limitation upon the
foregoing, nothing contained herein shall be construed to grant any rights to the Borrower or to impose any duties on
the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of
this Section 13.

14.     **Proceeds and Expenses of Dispositions.**  Borrower shall pay to the Lender on demand any and
all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Lender in protecting,
preserving, or enforcing the Lender's rights under or in respect of any of the Obligations or any of the Collateral.
After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral
shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or
preference as the Lender may determine, notwithstanding contrary instructions received by Lender from the
Borrower or any other third party.

15.     **Attorneys Fees and Expenses.**  Borrower agrees to reimburse Lender on demand for:

15.1    The actual amount of all costs and expenses, including attorneys' fees, which Lender has incurred
or may incur in:

15.1.1  Negotiating, preparing, or administering this Agreement and any documents prepared in
connection herewith;

13

EXHIBIT  A
PAGE  16

15.1.2   Any way arising out of this Agreement;

15.1.3   Protecting, preserving or enforcing any lien, security interest or other right granted by Borrower to Lender or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims;

15.2   The actual costs, including photocopying (which, if performed by Lender's employees, shall be at the rate of $0.10 per page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Borrower is a party; or

15.3   The actual amount of all costs and expenses, including attorneys' fees, which Lender may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Borrower, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (iii) opposing confirmation of Borrower's plan thereunder.

16.   **No Lien Termination without Release.**  In recognition of the Lender's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Borrower, Lender shall not be required to record any terminations or satisfactions of any of Lender's liens on the Collateral unless and until Borrower and any guarantors of the Obligations have executed and delivered to Lender a general release in the form of the Exhibit numbered with this Section number. **To the extent permissible by law, Borrower understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.**

17.   **Notices to Third Parties.**  Lender shall have the right at any time to give any Guarantor or Subordinating Creditor notice of any fact or event relating to this Agreement, as Lender may deem necessary or desirable in Lender's sole discretion, including, without limitation, Borrower's financial condition. Borrower shall provide to each Guarantor and Subordinating Creditor a copy of each notice, statement or report required to be given to Lender hereunder.

18.   **Information to Participants.**  Lender may furnish any financial or other information concerning Borrower, or any of its subsidiaries, heretofore or hereafter provided by Borrower to Lender, pursuant to this Agreement or otherwise, to any prospective or actual purchaser of any participation or other interest in any loans made by Lender to Borrower (whether under this Agreement or otherwise), or to any prospective purchaser of any securities issued or to be issued by Lender.

19.   **Entire Agreement.**  No promises of any kind have been made by Lender or any third party to induce Borrower to execute this Agreement.  No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

20.   **Notice.**

20.1   All notices required to be given to any party other than Lender shall be deemed given upon the first to occur of (i) posting of such notice as "certified mail" with the United States Postal Service, (ii) placement in a collection receptacle of, or in the custody of an employee or agent of, a nationally recognized express delivery courier service; or (iii) actual receipt by such party or an employee or agent of such party.  All notices to Lender shall be deemed given upon actual receipt by a responsible officer of Lender.

20.2   The addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

EXHIBIT  A
PAGE  17

## BORROWER

| | |
|---|---|
| Address: | Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L. |
| | 221 East Osceola Street |
| | Stuart, Florida 34994 |
| Attention: | Willie E. Gary, Senior Partner |

| | |
|---|---|
| *With a copy to:* | Chan Abney, General Counsel |
| Fax Number: | (772) 220-3343 or (772) 463-4318 |
| Email: | cba@williegary.com |

## LENDER

| | |
|---|---|
| Address: | LawFinance Group, Inc. |
| | 1700 Montgomery Street, Suite 249 |
| | San Francisco, CA 94111 |
| Attention: | Alan L. Zimmerman |
| Fax Number: | 415-617-9201 |
| E-Mail: | azimmerman@lawfinance.com |

20.3    **Counterparts.** This Agreement may be signed in any number of counterparts, each of whom shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

21.    **Amendment and Waiver.** Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Lender may have, nor shall any waiver by Lender hereunder be deemed a waiver of any default or breach subsequently occurring. Lender's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Lender would otherwise have.

22.    **Governing Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State. The parties waive the provisions of California Civil Code §1654 to the extent permitted by applicable law.

23.    **Venue.** Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Lender so elects, be instituted in any court sitting in the Chosen State, in the city in which Lender's chief executive office is located, or if none, any court sitting in the Chosen State (the "Acceptable Forums"). Borrower agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Borrower waives any right to oppose any motion or application made by Lender to transfer such proceeding to an Acceptable Forum.

24.    **Jury Trial Waiver.**

THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

15

EXHIBIT A
PAGE 18

In the event the Jury Trial Waiver set forth above is not enforceable, the parties elect to proceed under the Judicial Reference Provision attached as Exhibit 24.

25.     **Service Of Process.** Borrower agrees that Lender may effect service of process upon Borrower by overnight mail at the address set forth in this Agreement, or at the option of Lender, by service upon Borrower's registered agent for the service of process, as the case may be.

26.     **Assignment.** Lender may assign its rights and delegate its duties hereunder. Upon such assignment, Borrower shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Lender.

26.     **Note Register; Ownership of Note.** The ownership of an interest in this Note shall be registered on a record of ownership maintained by Borrower or its agent. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the transfer is registered on such record of ownership and the transferee is identified as the owner of an interest in the obligation. Borrower shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, this Note on the part of any other person or entity.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:               GARY, WILLIAMS, PARENTI, FINNEY, LEWIS,
                        MCMANUS, WATSON & SPERANDO, P.L.

                        By: _____
                        Name: Willie E. Gary
                        Title: Senior Partner


LENDER:                 LAWFINANCE GROUP, INC.

                        By: _____
                        Name: Alan Zimmerman     MICHAEL BLUM
                        Title: President          CEO

16

EXHIBIT A
PAGE 19

**EXHIBIT 1.2.22**

**BORROWER'S CASES EXEMPTED FROM REQUIREMENTS OF SECTION 1.2.22**

| | | |
|---|---|---|
| 10806 | BOGALUSA | $1,537,606.04 |
| 40153 | EYOB, MAMO (JOE) | $850,641.48 |
| 40429 | SPS-MOTOROLA | $2,065,960.31 |

EXHIBIT A
PAGE 20

## EXHIBIT 2.1.1

## PROCEDURE FOR REQUESTING ADVANCES

1.  Borrower shall provide Lender with a report at the time of requesting an Advance that indicates all Case Costs advanced by Borrower that are to be the basis, among others, for Lender to make Advances.

2.  This report shall include: (i) the type of cost disbursement; (ii) the vendor payee; (iii) the amount of the disbursement; and (iv) the check number.

3.  Borrower shall submit the executed Borrowing Base Certificate and Closing Statement.

4.  Upon Lender's receipt of all information of Borrower reasonably requested by Lender and the acceptance and approval by Lender, in its sole discretion, of Borrower's request for an Advance, funds requested by Borrower shall normally be remitted to Borrower within two Business Days, but in no event in more than five Business Days.

EXHIBIT _A_
PAGE _21_

**EXHIBIT 2.3**

**OPTIONAL CASE TRACKING OF INTEREST**

1.  **Case Cost Tracking.** If requested by Borrower, Lender shall track Case Costs for a particular Case within five Business Days of Lender's receipt of such request through the Maturity Date.

2.  **One-Time Setup Fee per Case:** There shall be a one-time set up fee of $50.00 for each Eligible Case set up and monitored through the Maturity Date.

3.  **Case Cost Reporting.** Lender shall provide a report monthly, and a final report within 30 days of the Maturity Date. The Case Cost report shall include the following: (i) the amount of principal outstanding; (ii) accrued interest to date; (iii) payoff amount on a given date; and (iv) per diem interest for each case monitored.

4.  **Reimbursement of Infrastructure Costs.** If Borrower incurs infrastructure costs to facilitate reports compatible with Lender's interest monitoring system, Lender shall reimburse Borrower for 50% of the costs Borrower incurs in upgrading its systems to provide such compatible reports to Lender. The maximum reimbursement shall be $10,000.00. Upon presentation to Lender of paid invoices for such systems upgrades, Lender shall apply such reimbursement to repay the loan in accordance with Section 3.2.

**EXHIBIT 3.3**

**ALL OF BORROWER'S DEPOSIT ACCOUNTS**

| Institution | Address | Account Number | Account Use |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

2

EXHIBIT A
PAGE 23

GARY WILLIAMS PARENTI
BANK ACCOUNTS

| Institution | Address | Account Number | Account Use | G/L # |
|---|---|---|---|---|
| Seacoast National | 2081 SE Ocean Blvd, Stuart, FL | | Operating/Cost | 1008-02 |
| Northern Trust | 2201 SE Kingswood Terrace, Stuart, FL | | Operating/Cost | 1045-02 |
| Northern Trust | 2201 SE Kingswood Terrace, Stuart, FL | Material Redacted | Operating/Cost | 1050-02 |
| Northern Trust | 2201 SE Kingswood Terrace, Stuart, FL | | Operating/Cost | 1060-02 |
| Northern Trust | 2201 SE Kingswood Terrace, Stuart, FL | | Payroll | 1080-02 |
| Northern Trust | 2201 SE Kingswood Terrace, Stuart, FL | | Employees FSA | 1085-02 |

## EXHIBIT 4.1.5

### FEES

1.  **Loan Fee.** Loan Fee of $45,000.00 payable at Closing. Borrower authorizes and instructs Lender to deduct the Loan Fee from the Initial Advance Amount.

2.  **Draw-Down Fee.** A Draw-Down Fee of $250.00 deducted from each Advance.

3.  **Audit Fee.** An Audit Fee of $1,000 per day per auditor, plus Lender's related out-of-pocket expenses, in connection with each audit Lender performs or causes to be performed hereunder, including any field audits and case reviews. Unless there is an Event of Default, Lender shall not charge Borrower for more than four (4) audits per year, but there shall be at least one audit per year.

4.  **Default Waiver Fee.** A Default Waiver Fee, equal to 0.05% of the Maximum Amount, payable immediately upon the waiver by Lender of any Event of Default hereunder, so long as the waiver was given at the Borrower's request.

5.  **Monthly Processing Fee.** A Monthly Processing Fee of $1,000.00 per month payable on the first day of each month, in arrears, until the Agreement is terminated and all Obligations are repaid in full.

6.  **Early Termination Fee.** The Early Termination Fee is waived.

7.  **Extension Fee.** If Borrower exercises its option to extend the Revolving Loan Period, an Extension Fee of $15,000.00 due on the first day of the extended Revolving Loan Period.

EXHIBIT _A_
PAGE _25_

EXHIBIT 5

FORM OF GUARANTY

See Guaranty presented separately.

F:\FirmFinance\FirmFinance Loans\FirmFinance Pending Loans\Gary Williams #2 ($13 mil cost loan)\$13 MM Cost Term Loan and Security
Agreement--(Gary Williams February 2007) version 8--3.16.07.DOC

EXHIBIT _A_
PAGE _26_

EXHIBIT 8.10

FINANCIAL STATEMENTS OF BORROWER

Other Indebtedness of Borrower

EXHIBIT _A_
PAGE _27_

STATEMENT OF ASSETS
AND LIABILITIES
INCOME TAX BASIS

GARY, WILLIAMS, PARENTI,
FINNEY, LEWIS, McMANUS, WATSON
& SPERANDO

As of 12/31/2006

| | |
|---|---:|
| **ASSETS** | |
| **CURRENT ASSETS** | |
| Checking | 38,527.84 |
| Trust | 6,443,795.10 |
| Accounts Receivable | 17,676,720.64 |
| | |
| TOTAL CURRENT ASSETS | 24,159,043.58 |
| | |
| CLIENT COSTS ADVANCED | 4,508,136.00 |
| | |
| **PROPERTY & EQUIPMENT** | |
| Furniture & Fixtures | 2,920,043.68 |
| Improvements | 583,316.11 |
| Renovations | 4,159,243.16 |
| Telephone System | 76,760.42 |
| Transportation Equipment | 1,239,395.41 |
| Signs | 15,898.97 |
| Aircraft | 3,429,033.29 |
| Computer Software | 207,224.77 |
| | 12,630,915.81 |
| Less Accumulated Depreciation | (7,686,321.74) |
| | |
| NET PROPERTY & EQUIPMENT | 4,944,594.07 |
| | |
| **OTHER ASSETS** | |
| Deposits | 55,584.00 |
| Investments - land | 102,936.08 |
| Loan cost net amortization | 70,833.34 |
| | |
| TOTAL OTHER ASSETS | 229,353.42 |
| | |
| TOTAL ASSETS | 33,841,127.07 |

EXHIBIT  A
PAGE  28

GARY, WILLIAMS, PARENTI,
FINNEY, LEWIS, McMANUS, WATSON
& SPERANDO

STATEMENTS OF ASSETS
AND LIABILITIES
INCOME TAX BASIS

As of 12/31/2006

**LIABILITIES & EQUITY**
**CURRENT LIABILITIES**

| | |
|---|---:|
| Trust Accounts | 6,443,795.10 |
| Payroll taxes payable | 0.00 |
| 401(k) profit sharing payable | 61,198.86 |
| FSA Plan Payable | 0.00 |
| Current portion long term debt | 2,319,651.66 |
| Bank Overdrafts | 1,279,581.18 |
| **TOTAL CURRENT LIABILITIES** | **10,104,226.80** |
| **LONG TERM DEBT** | |
| Note-Honda Financial Serv | 621.10 |
| Note-Mercedes Benz | 20,710.53 |
| Note-First National-2006 Honda | 23,611.69 |
| Note-First Nat'l-2005 Taurus | 15,946.72 |
| Note-First Nat'l-2006 Ford 500 | 17,937.93 |
| Note - Law Finance Group | 10,000,000.00 |
| Northern Trust-Line of Credit | 2,500,000.00 |
| Note-Aviation Finance-Gil | 1,658,102.20 |
| Loan Payable - Gary 737 LLC | (79,000.00) |
| Loan Payable - Gary Enterprise | (342,363.36) |
| Less principal due one year | 13,815,566.81 |
| | (2,319,651.66) |
| **TOTAL LONG TERM DEBT** | **11,495,915.15** |
| PARTNERSHIP EQUITY/(DEFICIT) | 14,865,569.92 |
| NET INCOME | (2,624,583.80) |
| **TOTAL EQUITY** | **12,240,985.12** |
| **TOTAL LIABILITIES & EQUITY** | **33,841,127.07** |

EXHIBIT __A__
PAGE __29__

## STATEMENT OF REVENUE & EXPENSE
### INCOME TAX BASIS

**GARY, WILLIAMS, PARENTI, FINNEY, LEWIS, McMANUS, WATSON & SPERANDO**

For the period
12/01/2006 to 12/31/2006

| | Reporting-period amount | Year-to-date amount | Same-period-last-yr amount | Year-to-date-last-yr amount |
|---|---|---|---|---|
| **REVENUE** | | | | |
| Legal Fees | 879,376.41 | 24,108,966.59 | 1,530,497.66 | 71,748,764.49 |
| Cost Reimbursements | 328,272.55 | 3,272,581.88 | 334,295.12 | 6,307,112.67 |
| | 1,207,648.96 | 27,381,548.47 | 1,864,792.78 | 78,055,877.16 |
| **DIRECT COSTS** | | | | |
| Client Costs | 103,809.16 | 3,838,952.38 | (1,706,978.30) | 3,035,151.08 |
| **GROSS PROFIT** | 1,103,839.80 | 23,542,596.09 | 3,571,771.08 | 75,020,726.08 |
| **OPERATING EXPENSES** | | | | |
| Accounting & Legal | 8,650.40 | 169,153.78 | (8,121,619.73) | 289,744.87 |
| Advertising | 350.00 | 224,081.04 | 74,295.00 | 677,300.00 |
| Aircraft Expense | 70,230.31 | 2,222,321.38 | 136,354.54 | 1,428,890.85 |
| Aircraft lease | 636,000.00 | 2,029,000.00 | 300,000.00 | 1,625,000.00 |
| Aircraft Exp-Entertainment | 0.00 | 12,218.94 | 0.00 | 0.00 |
| Amortization | 0.00 | 0.00 | 0.00 | 517.32 |
| Automobile | 7,633.14 | 145,347.77 | (14,173.51) | 122,297.39 |
| Automobile Lease | 3,139.03 | 32,578.57 | 8.78 | 23,772.74 |
| Bank Charges | 33,789.42 | 314,242.76 | 4,379.07 | 243,965.24 |
| Bad Debts | 0.00 | 0.00 | 0.00 | 0.00 |
| Contract labor | 264,090.30 | 361,624.23 | 35,054.72 | 328,697.38 |
| Commissions | 50,307.49 | 1,007,993.60 | 120,616.44 | 2,819,579.89 |
| Computer Charges | (2,186.87) | 108,531.73 | 2,413.81 | 140,870.38 |
| Contributions | 0.00 | 53,389.00 | 82,900.00 | 1,385,262.46 |
| Dues & Subscriptions | 856.72 | 38,912.66 | 963.00 | 67,779.59 |
| Entertainment | 321.93 | 140,457.47 | (12,814.20) | 379,818.66 |
| Equipment Lease | 5,885.49 | 152,270.80 | 0.00 | 171,366.78 |
| Freight | 3,851.31 | 68,241.01 | 2,410.76 | 75,185.90 |
| Goodwill - Clients | 0.00 | 923.04 | (257.05) | 0.00 |
| Goodwill - Employees | (1,101.07) | 181,904.67 | (4,438.00) | 73,115.18 |
| Insurance - Disability | 6,701.60 | 111,319.50 | 3,473.72 | 91,915.17 |
| Insurance - Health | 85,973.28 | 951,326.20 | 41,725.33 | 825,325.78 |
| Insurance - General | 147,642.92 | 1,389,261.29 | 69,683.42 | 1,209,871.52 |
| Insurance - Life | (167.63) | 77,076.74 | (7,189.81) | 31,961.69 |
| Interest | 178,234.87 | 2,319,537.80 | 153,372.14 | 1,150,149.09 |

EXHIBIT A
PAGE 30

# CASH FLOW STATEMENT

## GARY, WILLIAMS, PARENTI, FINNEY, LEWIS, McMANUS, WATSON & SPERANDO

For the period
12/01/2006 to 12/31/2006

| | Reporting-period Amount | Year-to-date Amount |
|---|---|---|
| Cash Beginning Balance | 5,599,036.94 | 5,295,139.53 |
| **Cash Flow from Operating** | | |
| Net Income | (2,462,337.11) | (2,624,583.80) |
| **Adjustments** | | |
| Depreciation | 24,259.03 | 285,533.28 |
| Amortization | 4,166.67 | 49,999.99 |
| Receivables | (268,621.92) | (3,062,614.62) |
| Employee Receivables | 4,745.05 | (31,140.79) |
| Payroll Tax Receivables | 0.00 | 0.00 |
| Client Costs Advanced | 0.00 | 0.00 |
| Deposits | 0.00 | (1,068.00) |
| Trust Payables | 466,959.45 | 1,508,124.89 |
| Payroll Related Payables | 31,048.74 | 37,268.48 |
| Bank Overdraft Payables | 1,279,581.18 | 353,882.65 |
| Net cash provided (used) | (920,198.91) | (3,484,607.92) |
| **Cash Flow from Investing** | | |
| Land | 2.28 | (84,500.09) |
| Equipment | 0.00 | 0.00 |
| Net cash provided (used) | 2.28 | (84,500.09) |
| **Cash Flow from Financing** | | |
| Loan Costs | 0.00 | 0.00 |
| Notes Payable | 729,755.90 | (433,253.09) |
| Equity | 1,073,726.73 | 5,189,544.51 |
| Net cash provided (used) | 1,803,482.63 | 4,756,291.42 |
| Net Increase (Decrease) | 883,286.00 | 1,187,183.41 |
| Cash Ending Balance | 6,482,322.94 | 6,482,322.94 |

EXHIBIT A
PAGE 21



| | | | | |
|---|---|---|---|---|
| Library | 529.53 | 20,317.72 | 2,553.05 | 19,574.05 |
| Licenses | (100.00) | 9,391.70 | 180.00 | 5,242.00 |
| Malpractice Claims | 0.00 | 896,215.07 | 7,100,780.30 | 7,100,780.30 |
| Malpractice Defense | 0.00 | 28,370.32 | 781,570.31 | 781,570.31 |
| Miscellaneous | 0.00 | 0.00 | 0.00 | 0.00 |
| Mileage Reimbursement | 0.00 | 3,756.82 | 165.21 | 4,884.32 |
| Non-deductible Items-Other | (1,446.10) | 103,979.86 | 1,943.00 | 1,943.00 |
| Office Supplies | 18,898.51 | 244,707.32 | (22,558.77) | 293,523.61 |
| Penalties | 0.00 | 0.00 | 0.00 | 58.00 |
| Political Contributions | 0.00 | 0.00 | 0.00 | 0.00 |
| Postage | 19,494.01 | 211,299.28 | 22,867.54 | 248,661.78 |
| Public Relations | 326,544.21 | 638,988.91 | (11,801.69) | 120,374.23 |
| Rent | 89,821.38 | 852,191.64 | 17,861.09 | 660,032.06 |
| Repairs - Equipment | 94.34 | 30,990.47 | 273,613.92 | 1,553,020.38 |
| Repairs - Building | 5,000.00 | 13,807.42 | (879.13) | 21,058.57 |
| Referral Fees | 49,521.35 | 35,534.14 | 35,000.00 | 303,233.96 |
| Security | (102.50) | 52,497.35 | (125.00) | 5,981.50 |
| Seminars | 0.00 | 21,390.88 | 1,036.00 | 42,674.31 |
| Taxes - Payroll | 69,209.53 | 238,540.86 | 30,289.16 | 808,599.98 |
| Taxes - Other | 0.00 | 2,364.09 | 291,666.65 | 374,499.37 |
| Telephone | 12,943.30 | 626,552.65 | 17,047.22 | 649,501.35 |
| Travel | 31,446.83 | 242,594.55 | 20,486.97 | 495,071.61 |
| Utilities | 10,307.37 | 112,524.39 | 6,242.51 | 74,814.19 |
| Wages | 1,405,389.09 | 9,257,688.17 | 698,540.01 | 23,268,350.93 |
| **TOTAL OPERATING EXPENSE** | 3,537,753.49 | 26,166,387.59 | 2,134,955.78 | 49,998,837.69 |
| **OTHER INCOME (DEDUCTIONS)** | | | | |
| Miscellaneous | 0.00 | 0.00 | 783,671.00 | 783,671.00 |
| Interest Earned | 0.00 | 5,266.31 | 384,178.46 | 364,292.41 |
| Dividends | 0.00 | 0.00 | 0.00 | 0.00 |
| Tax Exempt Interest | 0.00 | 0.00 | 0.00 | 0.00 |
| Casualty Loss | 0.00 | 329,472.38 | (2,062,592.86) | (61,641.72) |
| Gain/(Loss) Sale of Assets | 0.00 | 0.00 | (12,047.00) | (34,486.43) |
| Amortization | (4,166.67) | (49,999.99) | (4,166.70) | (29,166.67) |
| Depreciation | (24,256.75) | (285,531.00) | 61,304.83 | (334,268.04) |
| **NET INCOME/(LOSS)** | (2,462,337.11) | (2,624,583.80) | 567,162.03 | 25,713,288.94 |

EXHIBIT A
PAGE 32

<u>EXHIBIT 8.12</u>

<u>SCHEDULE OF LITIGATION AGAINST THE FIRM OR ANY OF ITS PARTNERS</u>

2

EXHIBIT A
PAGE 33

### Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L.

#### 2007 Litigation Matters
*As of* March 19, 2007

## I.   ACTIVE LITIGATION

1.   *Natural Answers, Inc. et. al. vs. Carlton Fields, P.A., et. al., Luis Prats, Esq., Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L. a Florida General Partnership; Case No.: 03- 16260CA 24*

| | |
|---|---|
| **Cause of action:** | Legal Malpractice; Breach of Attorney's Fiduciary Duties to the Client; and, Misconduct |
| **Underlying Case:** | Melvyn Estrin v. Natural Answers, Inc. |
| **Attorney of Record:** | Madison McClellan; Lisa McClellan |
| **Firm Counsel:** | Maria Sperando; Debra Nolan |
| **Opposing Counsel:** | Guy B. Bailey, Jr. <br> Bailey & Dawes L.C. <br> Continental Plaza, Suite 301 <br> 3250 Mary Street, Coconut Grove <br> Miami, Florida 33133-5232 |
| **Insurance Coverage:** | Coverage denied on the basis that "the allegations contained in the Complaint pertain only to events, acts, errors or omissions that occurred before June 1, 2003..." |
| **Status:** | Motion for Summary Judgment filed and Hearing scheduled for April, 2007. Update to be provided at 2/11/07 Partners Meeting. |

2.   *Cambridge Toxicology Group, Inc. v. Mississippi Litigation Group, et. al. including Linnes Finney and the law firm of Gary Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L.; Case No.: Civil Action 04-2044*

| | |
|---|---|
| **Cause of action:** | Breach of Contract |
| **Attorney of Record:** | Linnes Finney |
| **Firm Counsel:** | Linnes Finney |

*Attorney/Client Privileged Information*
*Page 1 of 3*

EXHIBIT  A
PAGE  34

| | |
|---|---|
| **Opposing Counsel:** | Paul C. Miniclier, T.A.<br>David A. Binegar<br>The Law Office of Paul C. Miniclier<br>1305 Dublin Street<br>New Orleans, LA 70118<br>(504) 864-1276 |
| **Status:** | The Complaint was filed in the United States Court in the Eastern District of Louisiana on July 22, 2004 against the firm and several other law firms who contracted with this company to assist in the Bogalusa litigation. There were three (3) claims regarding the expert testimony and a toxological study performed by this group, two (2) of which have been resolved. Mr. Finney has attempted to resolve the final issue but the plaintiffs will not let the Firm out on the basis of joint and several liability. This issue is on appeal. To date, the Firm's share of the judgment entered on the two (2) claims is $25,000.00. |

3. _Core Funding Group, LLC vs. Diana McDonald and the law offices of Diana McDonald, P.C. and Willie Gary, individually: Case No.: U - 00 - 3701_

| | |
|---|---|
| **Cause of action:** | Breach of Contact |
| **Underlying Case:** | ValuJet vs. Snowden, et. al. |
| **Attorney of Record:** | Mike Lewis |
| **Firm Counsel:** | Paige McMahon<br>42 East Fifth Street<br>Chillicothe, Ohio 4560 1-3302<br>(740) 774-2143 |
| **Opposing Counsel:** | Jack Brady<br>4052 Holland Sylvania<br>Toledo, Ohio 43623-2594 |
| **Status:** | Motion for Summary Judgment granted on May 3, 2005 in favor of defendants. The plaintiffs appealed the matter to the Court of Appeals who reversed the lower courts ruling finding that the Firm/WEG is liable on the basis of secured transactions law. The firm/WEG has appealed the matter to the Ohio Supreme Court and Oral Arguments are scheduled on April 3, 2007. The basis of the appeal is twofold: (1) an attorney who collects a fee which is partially owed to co-counsel under a contingency fee agreement is not an account debtor for purposes of imposing liability under secured transactions law; and, (2) an agreement between co-counsel to share fees earned under a contingent fee agreement is expressly excluded from the scope of secured transactions law. |

EXHIBIT __A__
PAGE __3<u>5</u>__

4. <u>Jacqueline Everson *vs. Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando,*</u>
   <u>*P.L.; Case No.: 2007CV129431*</u>

| | |
|---|---|
| **Cause of action:** | Legal Malpractice |
| **Underlying Case:** | Everson et al vs. The Coca Cola Company |
| **Attorney of Record:** | F. Shields McManus |
| **Firm Counsel:** | Not yet retained |
| **Opposing Counsel:** | Pro Se |
| **Status:** | Complaint served on February 16, 2007.  Answer due on March 19, 2007. |

## II.  <u>POTENTIAL FIRM LITIGATION</u>

1. <u>In Re: Estate of Karlos Stokes</u>

| | |
|---|---|
| **Cause of Action:** | Failure to pay subrogation lien |
| **Attorney of Record:** | Madison McClellan |
| **Firm Counsel:** | Not yet determined |
| **Opposing Counsel:** | Ryan Mahoney<br>Claims Manager<br>American Benefit Plan Administrators, Inc.<br>1921 Las Vegas Blvd. S. #106<br>Las Vegas, Nevada  89104-1309 |
| **Insurance Coverage:** | Notified of potential claim but coverage not yet determined. |
| **Status:** | We were notified on January, 2007 that an alleged subrogation lien in the amount of $1,000,110.24 had not been paid in the matter of <u>the Estate of Karlos Stokes, deceased</u>.  We have requested back up documentation from ABPA to support this claim which has not yet been received.  From a partial review of the file, there is no correspondence to support that such a lien was filed in this case. |

EXHIBIT A
PAGE 36

**EXHIBIT 9.1**

**REPORTING REQUIREMENTS**

1. A **Closed Case and Cash Receipt Report** certified by Borrower on or before the tenth day of each month accurate and complete as of the last day of the preceding month. In addition, when a Case is settled, Borrower shall promptly provide Lender with a copy of the settlement statement signed off by Borrower's clients and attorneys who have received payments of referral fees.

2. An **Eligible Case Report** certified by Borrower, on or before the tenth day of each month accurate and complete as of the last day of the preceding month.

3. **Other Reports.** Such other reports as to the status of Cases as Lender may request from time to time, in form and substance satisfactory to Lender.

4. **List of Cases.** On the tenth day of each new calendar quarter, or within 5 days of written request from Lender, a complete list of all Cases of Borrower on a read-only compact disk.

5. **Annual Financial Statements.** As soon as possible after the end of each fiscal year of Borrower: (i) the balance sheet as of the close of the fiscal year; (ii) the income statement for such year, together with a statement of cash flows; and (iii) personal financial statements of each of the Guarantors;

6. **Other Financial Statements.** No later than 45 days after the close of each Accounting Period: (a) Borrower's balance sheet as of the close of such Accounting Period and its income statement for that portion of the then current fiscal year through the end of such Accounting Period (along with a written explanation of any material variances from budget) certified by Borrower as being complete, correct, and fairly representing his financial condition and results of operations; (b) a monthly reconciliation of Borrower's bank accounts; and (c) accounts payable aging report.

7. **Tax Returns.** Copies of each of Borrower and the Key Employee's: (i) federal and state income tax returns (and any amendments thereto) within ten days of the filing thereof; and (ii) copies of any correspondence from the IRS, Franchise Tax Board or any other tax authority within five days of receipt thereof; and

8. **Case Documents.** Copies of all motions, decisions, orders or other documents from any court of jurisdiction with respect to the Cases as Lender may request from time to time, within five days filing or of receipt thereof, along with monthly reports, due on or before the tenth day of each month, updating the status of all Cases on a timely basis and an immediate report of any resolution of a Case or receipt of fees or costs from a Case.

F:\FirmFinance\FirmFinance Loans\FirmFinance Pending Loans\Gary Williams #2 ($13 mil cost loan)\$13 MM Cost Term Loan and Security Agreement--(Gary Williams February 2007) version 8--3.16.07.DOC

EXHIBIT _A_

PAGE _37_

**EXHIBIT 16**

**FORM OF GENERAL RELEASE**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits **LawFinance Group, Inc.** ("Releasee"), its parent, directors, shareholders, agents, employees and assigns, of and from any and all claims of every type, kind, nature, description or character, now known to Releasor or based on facts now known to Releasor or facts which with reasonable diligence on the part of Borrower would be known to Borrower, each as though fully set forth herein at length, to the extent that they arise out of or are in any way connected to or are related to that certain Cost Loan and Security Agreement dated as of February 19, 2007. March

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and the preparation of this release, or (b) it has knowingly determined that such advise is not needed.

DATED: 3-19-07

[Name of Releasor]:

By: _Willie Gary_
Name: Willie E. Gary
Title: Sr. Partner

4

EXHIBIT A
PAGE 38

## EXHIBIT 16

### JUDICIAL REFERENCE PROVISION

a.        In the event the Jury Trial Waiver set forth above is not enforceable, the parties elect to proceed under this Judicial Reference Provision.

b.        With the exception of the items specified in clause (c), below, any controversy, dispute or claim (each, a "Claim") between the parties arising out of or relating to this Agreement or any other of the Loan Documents, will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638 et seq. of the California Code of Civil Procedure ("CCP"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding.  Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the Superior Court in the County where the real property involved in the action, if any, is located or in a County where venue is otherwise appropriate under applicable law (the "Court").

c.        The matters that shall not be subject to a reference are the following: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including, without limitation, set-off), (iii) appointment of a receiver and (iv) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions)  This Agreement does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (i) and (ii) or to seek or oppose from a court of competent jurisdiction any of the items described in clauses (iii) and (iv).  The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this Agreement.

d.        The referee shall be a retired Judge or Justice selected by mutual written agreement of the parties.  If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative).  A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.

e.        The parties agree that time is of the essence in conducting the reference proceedings.  Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (a) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (b) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of the conference and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

f.        The referee will have power to expand or limit the amount and duration of discovery.  The referee may set or extend discovery deadlines or cutoffs for good cause, including a party's failure to provide requested discovery for any reason whatsoever.  Unless otherwise ordered based upon good cause shown, no party shall be entitled to "priority" in conducting discovery, depositions may be taken by either party upon seven (7) days written notice, and all other discovery shall be responded to within fifteen (15) days after service.  All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding.

g.        Except as expressly set forth in this Agreement, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript.  The party making such a request shall have the obligation to arrange for and pay the court reporter.  Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial.

h.        The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the State of California.  The rules of evidence applicable to proceedings at law in the State of California will be applicable to the reference proceeding.  The referee shall be empowered to enter equitable as well as legal relief,

5

EXHIBIT A
PAGE 39

enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision and, pursuant to CCP §644, the referee's decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court. The final judgment or order or from any appealable decision or order entered by the referee shall be fully appealable as provided by law. The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

i.       If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by reference procedure will be resolved and determined by arbitration. The arbitration will be conducted by a retired judge or Justice, in accordance with the California Arbitration Act §1280 through §1294.2 of the CCP as amended from time to time. The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

j.       THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

EXHIBIT  A
PAGE  40

## GENERAL RELEASE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits **LawFinance Group, Inc.** ("Releasee"), its parent, directors, shareholders, agents, employees and assigns, of and from any and all claims of every type, kind, nature, description or character, now known to Releasor or based on facts now known to Releasor or facts which with reasonable diligence on the part of Borrower would be known to Borrower, each as though fully set forth herein at length, to the extent that they arise out of or are in any way connected to or are related to that certain Cost Loan and Security Agreement dated as of February 19, 2007.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and the preparation of this release, or (b) it has knowingly determined that such advise is not needed.

DATED: 3-19-07

GARY, WILLIAMS, PARENTI, FINNEY,
LEWIS, MCMANUS, WATSON & SPERANDO,
P.L.

By: _____
Name: Willie E. Gary
Title: Senior Partner

EXHIBIT A
PAGE 41

## AMENDMENT NO. 1 TO

## COST LOAN AND SECURITY AGREEMENT

This AMENDMENT NO. 1 TO COST LOAN AND SECURITY AGREEMENT (this *"Amendment"*) is entered into as of January 4, 2008 by and between **Gary, Williams, Finney, Lewis, Watson & Sperando, P.L.** (*"Borrower"*) and **LFG National Capital, LLC** (*"LFG National"*). Capitalized terms used herein without definition shall have the respective meanings provided therefor in the "Agreement" (as defined below).

### RECITALS

A.      Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L. and Law Finance Group, Inc. (*"Lender"*) entered into that certain Cost Loan and Security Agreement dated March 19, 2007, as may be amended from time to time (the *"Agreement"*).

B.      The Agreement was assigned by Firm Finance to LFG National.

C.      Borrower and LFG National now desire to amend certain terms of the Agreement pursuant to Section 21 thereof.

### AMENDMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.      The name of the Borrower is amended to: "Gary, Williams, Finney, Lewis, Watson & Sperando, P.L."

2.      Except as expressly amended hereby, the Agreement, and all rights and obligations of the parties thereunder and under all schedules and exhibits thereto, shall remain in full force and effect. This Amendment shall not, except as expressly provided herein, be deemed to be a consent to any waiver or modification of any other terms or provisions of the Agreement.

3.      This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

4.      This Amendment is governed and interpreted under the laws of the Chosen State.

EXHIBIT _A_
PAGE _42_

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:                      GARY, WILLIAMS, FINNEY, LEWIS, WATSON & SPERANDO, P.L.

By: _____
Name: _____
Title: _____

LFG NATIONAL:                  LFG NATIONAL CAPITAL, LLC

By: _____
Name: _____
Title: _____

EXHIBIT A
PAGE 43

## AMENDMENT NO. 2 TO

### COST LOAN AND SECURITY AGREEMENT

This AMENDMENT NO. 2 TO COST LOAN AND SECURITY AGREEMENT (this "*Amendment*") is entered into as of March 21, 2008 by and between **Gary, Williams, Finney, Lewis, Watson & Sperando, P.L.** ("*Borrower*") and **LFG National Capital, LLC** ("*LFG National*"). Capitalized terms used herein without definition shall have the respective meanings provided therefor in the "Agreement" (as defined below).

### RECITALS

A.   Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L. and Law Finance Group, Inc. ("*Lender*") entered into that certain Cost Loan and Security Agreement dated March 19, 2007, as may be amended from time to time (the "*Agreement*").

B.   The Agreement was assigned by Firm Finance to LFG National.

C.   Borrower and LFG National now desire to amend certain terms of the Agreement pursuant to Section 21 thereof.

### AMENDMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.   Section 2.1.1.1 is deleted in its entirety and replaced with the following:

> **2.1.1.1 Revolving Loan Period.**  Subject to the terms and conditions of this Agreement, the Revolving Loan Period shall be from the Closing until August 31, 2008.

2.   Section 2.1.1.3 is deleted in its entirety and replaced with the following:

> **2.1.1.3 Total Term of Loan.**  The total term of the loan (consisting of the Revolving Loan Period plus the Term Loan Period) shall be twenty three months from the Closing, unless Borrower extends the Revolving Loan Period for an additional two years, in accordance with Section 2.1.4, in which case the total term of the loan shall be 47 months from the Closing.

3    Except as expressly amended hereby, the Agreement, and all rights and obligations of the parties thereunder and under all schedules and exhibits thereto, shall remain in full force and effect. This Amendment shall not, except as expressly provided herein, be deemed to

EXHIBIT A
PAGE 14

be a consent to any waiver or modification of any other terms or provisions of the Agreement.

4   This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

5   This Amendment is governed and interpreted under the laws of the Chosen State.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 2 to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:

GARY, WILLIAMS, FINNEY, LEWIS, WATSON & SPERANDO, P.L.

By: _____
Name: _____
Title: _____

LFG NATIONAL:

LFG NATIONAL CAPITAL, LLC

By: _____
Name: _____
Title: _____

EXHIBIT _A_
PAGE _45_

*Execution Version*

## AMENDMENT NO. 3 TO

## COST LOAN AND SECURITY AGREEMENT

This AMENDMENT NO. 3 TO COST LOAN AND SECURITY AGREEMENT (this "*Amendment*") is entered into as of May 2ʰ, 2009 by and between Gary, Williams, Finney, Lewis, Watson & Sperando, P.L. ("*Borrower*") and LFG National Capital, LLC ("*LFG National*"). Capitalized terms used herein without definition shall have the respective meanings provided therefor in the "Agreement" (as defined below).

## RECITALS

A.    Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L. and Law Finance Group, Inc. ("*Lender*") entered into that certain Cost Loan and Security Agreement dated March 19, 2007, as may be amended from time to time (the "*Agreement*").

B.    The Agreement was assigned by Firm Finance to LFG National.

C.    Borrower and LFG National now desire to amend certain terms of the Agreement pursuant to Section 21 thereof.

## AMENDMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.    Borrower acknowledges and agrees that: (i) an Event of Default has occurred and is continuing under Section 11 of the Agreement because: (i) Borrower has failed to make mandatory loan payments upon receipt of Eligible Case Costs recovered on any of Borrower's Cases as required under Section 2.2.2.1 of the Agreement; and (ii) certain other payments were made late in breach of the terms of the Agreement.

2.    Lender agrees to waive these Events of Default and forbear pursuing its remedies under the Agreement, subject to Borrower's compliance with the terms and conditions below.

3.    Section 1.2.24 is deleted in its entirety and replaced with the following:

> **1.2.24 "Interest Rate"** – The Index plus 13.0% percent per annum; *provided, however*, the Interest Rate for the period from January 1, 2009 through full repayment of the Obligations shall not be less than 16.0%. Provided, further, that if the Obligations are paid in full on or before December 31, 2009, then the minimum Interest Rate of 16% provided for in the previous sentence shall not apply and any interest actually paid in excess of the Index plus 13.0% percent per annum shall be credited to reduce the Loan

Balance.  The applicable Interest Rate will be adjusted on the first day of each calendar quarter based upon the Index as of such date.

4.   Borrower shall pay the incremental interest charged for the period from January 1, 2009 through May 30, 2009, i.e., the difference between the rate of: (i) the Index plus 13.0% percent per annum; and (ii) 16% in three equal installments due and payable on June 1, 2009, July 1, 2009 and August 1, 2009, respectively.

5.   A new Section 1.2.45 is added as follows:

1.2.45  "Firm's Fees" – all attorneys fees received by Borrower on Borrower's Case or Cases upon resolution, net of any referral fees paid to outside counsel.

*Subject to payment arrangements set forth in May 20, 2009 Addendum attached hereto.* LW WEB

6.   A new Section 2.2.4 is added as follows:

2.2.4   **Mandatory Payments of Firm's Fees:**  Upon Borrower's receipt of Firm's Fees from one or more of the following Cases, Borrower shall immediately remit the percentage of such Firm's Fees indicated below as a payment to Lender. At the time of such remittance of Firm's Fees from any of the Cases listed below, Borrower shall provide Lender with a copy of the client settlement statement for such Case, or an affidavit of Borrower certifying: (i) the name of the Case; (ii) the amount of the settlement or judgment awarded in such Case: (iii) the amount of the Firm's Fee in such Case; and (iv) the percentage of the Firm's Fee remitted to Lender.

2.2.4.1  In respect of *Jeff Pokorny, Larry Blenn et al. v. Quixtar, Inc., et al.* (the "Amway Case"), if the aggregate Firm's Fees in the Amway Case are greater than $5.0 million, Borrower shall immediately remit 33% of the Firm's Fees on that case as a payment to Lender; and if the aggregate Firm's Fees in the Amway Case are $5.0 million or less, Borrower shall immediately remit 20% of such Firm's Fee as a payment to Lender;

2.2.4.2  In respect of *DAG Enterprises, Inc. and Eyob Mamo v. Exxon Mobil Corporation, Exxon Corporation, and Mobil Corporation* (the "Exxon Case"), Borrower shall remit 50% of the Firm's Fees in the Exxon Case immediately upon receipt of such Firm's Fees by Borrower;

2.2.4.3  If any of the following Cases are resolved prior to January 1, 2010, Borrower shall remit 20% of the Firm's Fees on such Case, and if resolved on or after January 1, 2010, Borrower shall remit 25% of the Firm's Fees on such Case: (i) *Darius Marshall v. Staten Island Ferry* (the "New York Ferry Case"); (ii) *Monica Ways v. Honda of*

LW WEB

EXHIBIT ___A___
PAGE ___47___

*America* (the "Monica Ways Case"; Litigation against Merck & Co. Inc. related to Vioxx (the "Vioxx Cases"); and Litigation against R. J. Reynolds Tobacco Company et al. (the "Tobacco Cases"); and

**2.2.4.4** In respect of all other of Borrower's Cases, Borrower shall remit 10% of the Firm's Fees received before January 1, 2010, 15% of the Firm's Fees received between January 1, 2010 and June 30, 2010, and 20% of the Firm's Fees received after June 30, 2010, provided all Obligations have not been repaid by such date.

7.   Section 2.2.2.1 is deleted in its entirety and replaced with the following:

Not later than ten days following the end of any calendar month in which Borrower receives any Eligible Case Costs in any of the Borrower's Cases, Borrower shall remit as a payment to Lender the lesser of (a) the full amount of Eligible Case Costs recovered by the Borrower; and (b) the outstanding Loan Balance. In the event of a Case Lost, not later than ten days following the end of any calendar month in which the Case Lost occurred, Borrower shall notify Lender of such Case Lost and do one of the following: (i) if the amount of all Case Costs advanced and accrued interest for that Case Lost is less than or equal to $100,000.00, Borrower shall, within thirty days of the occurrence of such Case Lost, remit as a payment to Lender an amount equal to all Case Costs advanced and accrued interest for that Case Lost; or (ii) if the amount of all Case Costs advanced and accrued interest for that Case Lost is greater than $100,000.00, Borrower shall remit as a payment to Lender an amount equal to all Case Costs advanced and accrued interest for that Case Lost in three equal installments, each due not later than thirty, sixty and ninety days, respectively, following the occurrence of such Case Lost. Lender shall apply such payments in accordance with Section 3.2.

8.   Section 1.2.30 is deleted in its entirety and replaced with the following:

**1.2.30**   "**Maturity Date**" – the Maturity Date shall be June 30, 2010.

9.   Sections 2.1.1, 2.1.2, 2.1.3 and 2.1.4 are deleted in their entirety.

10.   A new Section 2.2.1.1 is added as follows:

**2.2.1.1** In addition to all other payments required hereunder, Borrower shall make payments such that the Loan Balance is: (i) not greater than $6.0 million as of December 31, 2009; and (ii) not greater than $2.0 million as of June 30, 2010.

11.   A new Section 2.2.1.2 *et seq.* is added as follows:

**2.2.1.2 Extension of Maturity Date.** Provided no Event of Default has occurred and is continuing, and that the Loan Balance is not greater than $2.0

EXHIBIT A
PAGE 43

million as of June 30, 2010, Borrower shall have the option to extend the Maturity Date until December 31, 2010.

          **2.2.1.2.1**   **Extension Fee.**  If Borrower extends the Maturity Date beyond June 30, 2010, Borrower shall pay an extension fee (the "Extension Fee") equal to 1% of the Loan Balance as of June 30, 2010.

          **2.2.1.2.2**   **Interest Rate.**  If Borrower extends the Maturity Date beyond June 30, 2010, the Interest Rate for the period beginning on July 1, 2010 until the extended Maturity Date shall be the Index plus 13.0% percent per annum.

12.      Item 7 is deleted from Exhibit 4.1.5.

13.      Except as expressly amended hereby, the Agreement, and all rights and obligations of the parties thereunder and under all schedules and exhibits thereto, shall remain in full force and effect.  This Amendment shall not, except as expressly provided herein, be deemed to be a consent to any waiver or modification of any other terms or provisions of the Agreement.

14.      This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

15.      This Amendment is governed and interpreted under the laws of the Chosen State.

[Remainder of page intentionally left blank.]

EXHIBIT A
PAGE 49

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 3 to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:

**GARY, WILLIAMS, FINNEY, LEWIS, WATSON & SPERANDO, P.L.**

By: _____
Name: Willie Gary / Lorenzo Williams
Title: Partners

LFG NATIONAL:

**LFG NATIONAL CAPITAL, LLC**

By: _____
Name: William Burns
Title: Member

EXHIBIT A
PAGE 50

# GARY, WILLIAMS, FINNEY, LEWIS, WATSON & SPERANDO, P.L.

## ATTORNEYS AND COUNSELORS AT LAW



WATERSIDE PROFESSIONAL BUILDING
221 E. OSCEOLA STREET
STUART, FL 34994

(772) 283-8260
Fax No. (772) 220-3343
1-800-329-4379

W. E. GARY PROFESSIONAL CENTER
320 S. INDIAN RIVER DRIVE
POST OFFICE BOX 3390
FT. PIERCE, FLORIDA 34948-3390

(772) 464-2352
Fax No. (772) 464-4226
1-800-330-2832

REGIONS BANK CENTER
111 N. ORANGE AVENUE, SUITE 1450
ORLANDO, FLORIDA 32801

(407) 649-7171
Fax No. (407) 649-7755

PLEASE REPLY TO:

May 20, 2009

**PARTNERS**
Willie E. Gary
Lorenzo Williams
* Linus Finney, Jr.
Michael A. Lewis
Donald N. Watson
** Maria P. Sperando
Paul P. McMahon
* Gloretta H. Hall
**·*** Tricia P. Hoffler
Manuel Socias

Alan Zimmerman, Esq.
Chief Executive Officer
A.L. Zimmerman Capital
122 Main Street
Tiburon, CA  94920

In Re:  Addendum to Amendment No. 3 to Cost Loan and Security Agreement

Dear Alan:

I am writing confirm our telephone conversation wherein we agreed to attach an Addendum to the above referenced 3rd Amendment to the Cost Loan and Security Agreement setting forth certain conditions of payment on fees received by the Firm prior to the date of this letter. Specifically, as it relates to Section 2.2.4 Mandatory Payment of Firm's Fees, the Law Finance Group hereby agrees to accept payment in three (3) installments for fees received prior to the date of this letter on the following cases:

**ASSOCIATES**
** Paul D. Mark Lucas
Joan A. Laws
Thomas E. Weiksnar, LLM
******* Maryann Diaz
Victor G. Swift
* Phyllis M. Gillespie
*·*** Alton C. Hale, Jr.
** Tanisha Nunn Gary
Jason L. Williams
* Debra S. Nolan
** Arnold S. Gaines
Mark Miller
Charles E. Emanuel
Anika R. Hardmon
** Marwan E. Porter
Yeverly D. Gary
* Hugh J. Elghnia II

- Darius Marshall vs. Staten Island Ferry
- Monica Ways vs. Honda of America
- Merck & Co., Inc.
- R.J. Reynolds Tobacco Company, et al.

The first payment representing 20% of fees on these cases will be made along with the interest payment in June, 2009; the 2nd payment in July, 2009; and, the 3rd payment in August, 2009.  Please notify the undersigned in writing not later than the close of business on May 22, 2009 should you have a different understanding than the terms outlined herein.

**OF COUNSEL**
* Robert V. Parenti
Sekou M. Gary

**GENERAL COUNSEL**
*** Chan Bryant Abney

* Board Certified
Civil Trial Lawyer

I appreciate your willingness to work with us on this issue.  Thank you again.

Yours truly,

Chan Bryant Abney, Esq.

cc:   Willie E. Gary, Esq.
       Lorenzo Williams, Esq.

EXHIBIT A
PAGE 1

Gary, Williams, Finney, Lewis, Watson Sperando, P.L.
Attachment to Addendum to Amendment No. 3
Cost Loan and Security Agreement
2009

| CLIENT | FEES RECEIVED | DATE RECEIVED | | |
|--------|--------------:|:-------------:|--|--|
| Vioxx | | | | |
| | $99,239.44 | Nov-08 | | |
| | $187,710.44 | Dec-08 | | |
| | $95,603.23 | Jan-09 | | |
| | $137,240.92 | Feb-09 | | |
| | $36,022.50 | Mar-09 | | |
| | $118,655.16 | Apr-09 | | |
| | **$674,471.69** | | | |
| | | | | |
| Engle/Tobacco | | | | |
| | $244,350.00 | Nov-08 | | |
| | $283,950.00 | Dec-08 | | |
| | $70,200.00 | Jan-09 | | |
| | $143,698.00 | Apr-09 | | |
| | **$742,198.00** | | | |
| | | | | |
| Monica Ways | | | | |
| | **$133,000.00** | May-09 | | |
| | | | | |
| Staten Island Ferry/D. Marshall | | | | |
| | **$331,236.83** | Dec-08 | | |
| | | | | |
| Total | **$1,880,906.52** | | | |
| 20% | **$376,181.30** | | | |
| | | | | |
| | June Payment | $125,393.77 | | |
| | July Payment | $125,393.77 | | |
| | August Payment | $125,393.77 | | |
| | | $376,181.30 | | |

EXHIBIT __A__
PAGE __52__