UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LFG NATIONAL CAPITAL, LLC,

                              Plaintiff,

        -v-                                                 1:12-CV-446

GARY, WILLIAMS, FINNEY, LEWIS, WATSON,
AND SPERANDO P.L.; WILLIE GARY; and
LORENZO WILLIAMS,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GARY, WILLIAMS, FINNEY, LEWIS, WATSON,
AND SPERANDO P.L.,

                              Counter-claimant,

        -v-

LFG NATIONAL CAPITAL, LLC; LAWFINANCE
GROUP, INC.; and LFG SERVICING, LLC,

                              Counter-defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

CHADBOURNE & PARKE LLP                    SCOTT S. BALBER, ESQ.
Attorneys for Plaintiff and Counter-defendants    JONATHAN C. CROSS, ESQ.
30 Rockefeller Plaza                      ANDREA L. VOELKER, ESQ.
New York, NY 10112

SUSSMAN & WATKINS, LLP                MICHAEL H. SUSSMAN, ESQ.[1]
Attorneys for Defendants and Counter-claimant
55 Main Street, Suite 6
P.O. Box 1005
Goshen, NY 10924

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff LFG National Capital, LLC ("plaintiff" or "LFG National") brought suit[2] against

Gary, Williams, Finney, Lewis, Watson, and Sperando P.L. (the "Firm" or "counter-claimant");

---

[1] Defendants Gary, Williams, Finney, Lewis, Watson, and Sperando P.L.; Willie Gary; and Lorenzo Williams were initially represented by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin"). Harvey I. Saferstein, Esq., Nada I. Shamonki, Esq., and Sarah J. Robertson, Esq. of Mintz Levin's Los Angeles, California office appeared on behalf of defendants—presumably because this case was filed and initially litigated in the Central District of California. After the case was transferred to the Northern District of New York, see infra note 2, Michael H. Sussman, Esq. appeared as local counsel for defendants for the sole purpose of filing a motion to transfer the case back to the Central District of California. The preceding attorneys all remained as attorneys of record for defendants.

Prior to oral argument on the motions which are the subject of this Memorandum-Decision and Order, attorney Shamonki requested an adjournment of the oral argument because attorney Sussman, who is located in and regularly practices in New York, was unavailable to argue the motions in Utica, New York. The request was denied and two days prior to oral argument, Narges M. Kakalia, Esq. of Mintz Levin's New York, New York office entered a notice of appearance on behalf of defendants. Attorney Kakalia then argued the motions on May 23, 2012 in Utica, New York.

One month later, on June 22, 2012, Mintz Levin requested to withdraw as counsel for defendants "because the majority of the Mintz Levin Counsel is based in Los Angeles and, now that the case has been transferred to New York, the Mintz Levin Counsel's continued involvement in the case will significantly increase Defendants' attorneys' fees and costs." Dkt. No. 126. That request was granted and attorneys Saferstein, Shamonki, Robertson, and Kakalia were terminated from the docket. As a result, attorney Sussman remains as the only attorney of record for defendants.

[2] Plaintiff LFG National moved to amend the complaint on September 30, 2011, to add allegations regarding LFG National's entitlement to escrow funds in Simpson v. New York State Department of Civil Service, Northern District of New York case number 1:04-cv-1182 ("Simpson") and to add allegations of the Firm's defaults since the filing of the original complaint. See Dkt. No. 44. The motion to amend was granted on March 8, 2012, by United States District Judge Philip S. Gutierrez in the Central District of California. The following day, Judge Gutierrez granted LFG National's motion to transfer venue to the Northern District of New York. Although the docket does not indicate proof of service of the amended complaint, defendants filed an answer to the amended complaint on April 5, 2012. Technically Gary and Williams' motion to dismiss was made on the original complaint and the operative pleading is now an amended complaint. However, the amended complaint includes no new allegations regarding the individual defendants, thus the filing of the amended complaint does not alter the analysis of defendants' motion to dismiss.

and individuals Willie Gary ("Gary") and Lorenzo Williams ("Williams") (collectively "defendants") alleging:  (1) Breach of Contract against the Firm; and (2) Breach of Guarantees against Gary and Williams.  Defendants answered and the Firm counterclaimed against LFG National; LawFinance Group, Inc. ("LawFinance"); and LFG Servicing, LLC ("LFG Servicing") (collectively "counter-defendants") alleging:  (1) Breach of the Implied Covenant of Good Faith and Fair Dealing; (2) Interference with Contractual Relations; (3) Violation of Florida Usury Law; (4) Violation of California Usury Law; and (5) Unfair Business Practices under the California Code.

Individual defendants Gary and Williams moved to dismiss plaintiff's second cause of action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposed and the individual defendants replied.

Counter-defendants moved to dismiss all five counterclaims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The counter-claimant Firm opposed and counter-defendants replied.

Oral argument was heard on both motions in Utica, New York on May 23, 2012. Decision was reserved.

## II. BACKGROUND

The following facts, taken from the complaint and counterclaims, are undisputed unless otherwise noted.

The defendant Firm is a law practice registered as a Florida professional limited liability company.  The Firm has a national reputation for large scale personal injury and civil rights litigation, and its business is typically contingent fee work.  Gary and Williams are trial attorneys and partners of the Firm.

On March 19, 2007, the Firm borrowed approximately $10 million from LawFinance, a California corporation.  Zimmerman Decl., June 7, 2011, Ex. A, Dkt. No. 23-1 ("Loan Agreement").  The Loan Agreement replaced, and provided funds to refinance amounts due under an earlier, similar loan between the Firm and LawFinance.  Gary and Williams each executed personal guarantees in connection with the Loan Agreement.  Zimmerman Decl., June 7, 2011, Exs. E, F, Dkt. Nos. 23-1, 23-2 ("Guarantees").

On March 22, 2007, three days after executing the Loan Agreement, LawFinance assigned all of its interests in the loan to its affiliate LFG National, a Delaware limited liability company with its principal place of business in Nevada.

The purpose of the loan was to enable the Firm to finance the payment of litigation costs in its pending cases.  The interest rate under the Loan Agreement was "[t]he Index plus 13.0% per annum"[3] and the default interest rate was "[t]he Interest Rate plus 5% per annum"; rendering the default interest rate to be at least 18%.  Loan Agreement §§ 1.2.24, 1.2.16.  In addition to mandated principal and interest payments, the Loan Agreement required the Firm to remit "Case Costs" to LFG National within ten days of the end of the calendar month in which the Firm received the funds.  Id. § 2.2.2.1.  "Case Costs" are defined as "costs advanced by Borrower on Eligible Cases for which Borrower is legally entitled under a fee agreement to be reimbursed out of the first Proceeds of a Case and any interest payable to Borrower thereon."  Id. § 1.2.9.

Further, under the terms of the Guarantees, any Firm indebtedness to Gary or Williams is subordinated to the payment of the Firm's obligations to LFG National.  See

---

[3]  The Index rate is determined by reference to the three-month London interbank rate.  See Loan Agreement § 1.2.22.

Guarantees § 7.2.  Thus, no payment of any kind with respect to monies owed to Gary or Williams could be made until all of the Firm's obligations to LFG National were satisfied.  If payments were made to Gary or Williams, they were to be held in trust for LFG National.  Id.

Pursuant to the Loan Agreement, the Firm granted to LFG National a first-priority security interest in the Firm's collateral.  Loan Agreement § 5.  The term "Collateral" encompasses essentially all of the Firm's property and assets, including its cash, general intangibles, rights to attorneys' fees and costs, and equipment.  Id. § 1.2.15.  LFG National perfected its liens as of June 8, 2005, through the filing of a Florida Uniform Commercial Code Financing Statement (with a subsequent continuation filed on June 8, 2010).

LFG National and the Firm amended the Loan Agreement for the third time on May 29, 2009.  Loan Agreement Amendment No. 3 ("Amendment").  LFG National alleges that by this date, the Firm defaulted under the terms of the Loan Agreement.  The Amendment provides that an "Event of Default" occurred and was continuing under section 11 of the Loan Agreement because the Firm failed to make mandatory payments upon receipt of Case Costs, and made other payments late in breach of the Loan Agreement.  Id. ¶ 1.  According to the Amendment, LFG National agreed to waive the Firm's defaults, subject to its compliance with the terms and conditions in the Amendment.  Id. ¶ 2.

As consideration for LFG National's waiver of the Firm's defaults, the parties agreed to alter the interest rate to a fixed rate of 16%, with an option to reduce the rate to the original Index plus 13% per annum if the Firm paid the loan in full before the end of 2009.  Id. ¶ 3 (replacing section 1.2.24 of Loan Agreement with "[t]he Index plus 13.0% percent annum; provided, however, the Interest Rate for the period from January 1, 2009 through full repayment of the Obligations shall not be less than 16.0%.").  The modified 16% interest

rate, plus the original 5% default interest rate, resulted in a default interest rate as high as 21%.

The loan matured on June 30, 2010, and the Firm was notified on July 1, 2010, that the maturity date would not be extended and that all sums were due and payable in full immediately.  As of October 5, 2011, the date the proposed amended complaint was filed, the total amount due under the Loan Agreement, excluding costs and attorneys' fees for this litigation (which the Loan Agreement dictates the Firm must pay), was $11,137,630.03. Proposed Am. Compl. ¶ 36.

Plaintiff contends defendants have been in continuous default of their obligations since at least July 16, 2009, when the Firm failed to remit a required interest payment.  Id. ¶ 24.  It is also alleged the Firm missed interest payments since that date.  Id.  Defendants deny they breached the Loan Agreement and contend the Firm has made substantial payments of both interest and principal since 2005.  Countercl. ¶ 23.  Defendants allege that since May 29, 2009, the Firm has paid back $2,477,827.32 in interest; $801,575.08 in principal; and $6,000.00 in fees.  Id.

Plaintiff also contends the Firm breached the Loan Agreement when it failed to remit Case Costs on numerous occasions including most recently on September 7, 2011, when the Firm received a settlement payment as the plaintiff's counsel in the case of Pericles v. Buyak, Middle District of Florida case number 6:11-cv-1269.  Further, the Firm acted as co-counsel with Sussman & Watkins, LLP, representing the plaintiff in Simpson before the undersigned.  A stipulation of settlement in Simpson was approved on April 25, 2011, and New York State was ordered to pay attorneys' fees to the Firm and Sussman & Watkins, LLP.  After LFG National and another creditor of the Firm asserted they held valid liens over

those attorneys' fees payments, a June 9, 2011, order was issued modifying the April 25, 2011, order and directing the payment of attorneys' fees to Sussman & Watkins, LLP in a separate escrow account pending further order.

In attempting to collect amounts due under the Loan Agreement, LFG National and LFG Servicing contacted several third parties with whom the Firm had business relationships. LFG National and LFG Servicing informed those parties of LFG National's status as a secured creditor of the Firm and advised that the Firm defaulted under the Loan Agreement. On April 26, 2011, plaintiff's attorneys wrote Sussman & Watkins, LLP, the Firm's local counsel in Simpson, whom it was ordered should collect the Firm's fee from New York State. Countercl. Ex. B ("Sussman letter").  The Sussman letter and its enclosed correspondence from LFG Servicing demanded Sussman & Watkins, LLP forward those attorneys' fees due to the Firm, directly to LFG Servicing for amounts owed under the Loan Agreement.  Id.

On May 20, 2011, plaintiff's attorneys wrote Boies, Schiller, & Flexner LLP, the Firm's co-counsel in Pokorny v. Quixtar Inc., Northern District of California case number 3:07-cv-201-SC ("Pokorny") in which settlement was pending.  Countercl. Ex. C ("Boies letter").  According to the Boies letter, Boies, Schiller, & Flexner LLP was in a position to receive fees from the defendants in Pokorny and pay the Firm its share of such fees.  Id. The Boies letter also stated:  "Be advised that LFG intends to advise Judge Conti [the presiding United States District Judge in Pokorny] on Monday that LFG possesses a first lien security interest over all sums due to the Firm."  Id.

Also on May 20, 2011, plaintiff's attorneys wrote the New York State Attorney General's Office, counsel for defendant New York State in Simpson, who owed the Firm and Sussman & Watkins, LLP attorneys' fees.  Countercl. Ex. D ("Attorney General letter").

The Attorney General letter and its enclosed correspondence from LFG Servicing demanded New York State forward those attorneys' fees due to the Firm, directly to LFG Servicing for amounts owed under the Loan Agreement.  Id.

The Firm alleges these letters "seriously affected" and "possibly damaged" the Firm's relationships with its clients and co-counsel.  Countercl. ¶ 28.  Further, the Firm accuses LFG National of acting in bad faith and alleges its motive in demanding payment of funds pursuant to the Loan Agreement was "to prevent to prompt repayment of amounts owed by the Firm" and to collect exorbitant amounts of default interest.  Id. ¶ 29.

In addition to the Sussman, Boies, and Attorney General letters, the Firm alleges counter-defendants sent letters to "the Court in the Pokorny case and the Simpson case."  Id. ¶¶ 33, 41, 63.  Finally, although not alleged in the counterclaim,[4] the Firm contends "LFG has increased its aggressive and harassing collection efforts by threatening to send similar [collection] letters to the Firm's clients."  Counter-claimant's Opp'n to Mot. to Dismiss, Dkt. No. 51 at 2.  The Firm submitted a letter by LFG Servicing Chief Executive Officer Alan Zimmerman ("CEO Zimmerman") to Gary and Williams.  Robertson Decl., Oct. 3, 2011, Ex. D ("Zimmerman letter").  The Zimmerman letter advised Gary and Williams that LFG National learned that certain of the Firm's cases had recently settled.  Accordingly, CEO Zimmerman enclosed "letters of instruction under Section 9-406 of the UCC to your firm's clients, Eddie Persons, Loveding Pericles, and Esther Pericles ("Plaintiffs"), directing that they pay to [LFG] National Capital all sums representing fees and costs owed to your firm."  Id.  The Zimmerman letter concluded by stating "I trust that you will forward the attached

---

[4]  The Firm noted that it plans to amend its counterclaim to add allegations regarding counter-defendants' most recent conduct; however it has not done so to date.

correspondence to Plaintiffs . . . ." Id.  Pre-drafted letters from CEO Zimmerman and LFG Servicing to the above-named plaintiffs were enclosed.

## III.  DISCUSSION

The parties agree that California law applies pursuant to the terms of the Loan Agreement.  Loan Agreement §§ 1.2.12, 22.

### A.  Motion to Dismiss—Legal Standard

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's—as well as here, a counter-claimant's—factual allegations must be accepted as true and all reasonable inferences must be drawn in their favor to assess whether a plausible claim for relief has been stated. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–61, 127 S. Ct. 1955, 1964–67 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 684, 129 S. Ct. 1937, 1953 (2009) (holding that the pleading rule set forth in Twombly applies in all civil actions).  The factual allegations must be sufficient "to raise a right to relief above the speculative level," crossing the line from conceivable to plausible.  Twombly, 550 U.S. at 555, 127 S. Ct. at 1965.  Additionally, "a formulaic recitation of the elements of a cause of action will not do." Id. at 555, 127 S. Ct. at 1965.  "A claim has facial plausibility when the plaintiff [or counter-claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant [or counter-defendant] is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. at 1965).

Thus, in reviewing the sufficiency of the pleading, a court first may identify legal conclusions that are not entitled to the assumption of truth.  Id. at 679, 129 S. Ct. at 1950.  The court should then "assume [the] veracity" of well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief."  Id.

When deciding a motion to dismiss, a district court may consider documents attached to the complaint (and counterclaim) as exhibits or incorporated by reference therein.  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  Even if a document is not incorporated by reference, a court may nevertheless consider it "where the complaint [or counterclaim] relies heavily upon its terms and effect, thereby rendering the document integral to the complaint [or counterclaim]."  Id. (internal quotations omitted).  However, even if the document is integral, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  Id. (internal quotations omitted).

Surprisingly, the essential documents at issue here—the Loan Agreement, Guarantees, and Amendment—are attached to neither the complaint nor counterclaim. However, both the complaint and counterclaim rely heavily on these documents, rendering them integral to the pleadings.  Further, no dispute exists regarding the authenticity or accuracy of the documents.  All three documents were attached to the June 7, 2011, Zimmerman declaration submitted in support of plaintiff's ex parte application for a temporary restraining order and preliminary injunction.

### B. Gary and Williams' Motion to Dismiss

Plaintiff's second claim alleges Gary and Williams breached the terms of their respective Guarantees by failing, after receiving written demand from LFG, to make payments to LFG National.  LFG National contends Gary and Williams each received payments from the Firm while the Firm owed sums to LFG.  Gary and Williams argue this claim should be dismissed as premature because LFG has not first exhausted its remedies against the Firm as required.

At the outset it should be noted that California abolished the distinction between sureties and guarantors.[5]  Cal. Civ. Code § 2787 (West 2012).  In California, "[a] surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor."  Id.  Thus, both the terms "surety" and "guarantor" are appropriate to describe Gary and Williams' obligations to LFG National under the Loan Agreement and Guarantees.

California law permits a surety or guarantor to insist that a creditor proceed against the debtor, including exhausting any security, before bringing suit to enforce a guarantee.  See e.g., Pearl v. Gen. Motors Acceptance Corp., 13 Cal. App. 4th 1023, 1029 (Cal. Ct. App. 4th Dist. 1993).  California Civil Code section 2845 provides in part:  "A surety may require the creditor . . . to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue, and which would lighten the surety's burden."  Cal. Civ. Code § 2845.  Further, section 2849 requires a creditor to exhaust the security given by the principal debtor.  Id. § 2849.  That provision states:  "A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, whether the surety was aware of the security or not."  Id.

However, section 2856(a) of the California Civil Code provides that the statutory protections in sections 2845 and 2849 may be waived.  Id. § 2856(a) ("Any guarantor . . .

---

[5]  Generally, the terms "surety" and "guarantor" have different meanings.  A surety is "[a] person who is primarily liable for paying another's debt or performing another's obligation."  Black's Law Dictionary (9th ed. 2009), surety.  A guarantor is "[o]ne who makes a guaranty or gives security for a debt."  Id., guarantor. "While a surety's liability begins with that of the principal, a guarantor's liability does not begin until the principal debtor is in default."  Id.  Thus, a guarantor is only liable to the creditor if the debtor does not meet the duties owed to the creditor, while the surety is directly liable.  Id., surety.

may waive . . . any other rights and defenses that are or may become available to the

guarantor or other surety by reason of Sections 2787 to 2855, inclusive."); see also Pearl, 13

Cal. App. 4th at 1029  ("Sections 2845 and 2849 have often been found to have been waived

by language contained in documents.").  Section 2856(b) further states:

> A contractual provision that expresses an intent to waive any or all
> of the rights and defenses described in subdivision (a) shall be
> effective to waive these rights and defenses without regard to the
> inclusion of any particular language or phrases in the contract to
> waive any rights and defenses.

Id. § 2856(b).  Upon a guarantor's waiver of these protections, a creditor may pursue the

guarantor directly without first proceeding against the principal debtor.  At issue are whether

Gary and Williams waived the protections of section 2845 and 2849.  If a valid waiver is

found, LFG National may proceed against Gary and Williams individually without regard to

LFG National's exhaustion of remedies and collateral against the Firm.

Plaintiff relies on section 2.4 of the Guarantees, entitled "Joint and Several Obligation;

Independent Obligation" to establish Gary and Williams' waiver of the section 2845 and 2849

defenses.  That section provides in part:

> The obligations of Guarantor hereunder are direct and primary
> and are independent of the obligations of Debtor or any other
> such guarantor, and a separate action may be brought against
> Guarantor irrespective of whether an action is brought against
> Debtor . . . . Guarantor's liability hereunder shall not be contingent
> upon the exercise or enforcement by Creditor of any remedies it
> may have against Debtor . . . or the enforcement of any lien or
> realization upon any security Creditor may at any time possess.

Guarantees § 2.4.  LFG National urges that this language is just as strong as, or stronger,

than the contractual language found sufficient for a waiver by several California courts.  In

opposition, Gary and Williams contend they did not waive their rights via section 2.4 because

nothing about that section "would alert someone that Section 2.4 allegedly contains a knowing and intentional waiver of a critical and important right."  Defs.' Reply in Supp. of Mot. to Dismiss, Dkt. No. 57 at 5.

Instead, Gary and Williams rely on section 6, entitled "Waivers by Guarantors of Suretyship Defenses" to argue they did not waive the statutory protections.  Section 6 states "Guarantor waives any and all suretyship defenses, whether arising by contract, statute or by operation of law."  Id. § 6.  Following that statement are five enumerated rights which guarantors waive.  Id. §§ 6.1–6.5.  The section 2845 and 2849 exhaustion requirements are not listed.  Gary and Williams contend that a waiver of sections 2845 and 2849 cannot be found because the waiver section does not enumerate those defenses.  At oral argument, plaintiff responded that the section 2845 and 2849 defenses are not suretyship defenses but instead an "election of remedies" and thus they need not be listed in section 6 of the Guarantees.

First, with respect to section 2.4 of the Guarantees, similar language has been found to be a waiver of the section 2845 and 2849 protections.  In Guild Wineries & Distilleries v. Land Dynamics, 103 Cal. App. 3d 966 (Cal. Ct. App. 1st Dist. 1980), the guaranty stated that the guarantor's obligations were joint and several, and independent of the obligations of the borrower, and that a separate action may be brought against the guarantor whether an action is brought against the borrower.  Id. at 973.  The guaranty also included the following language:  "Guarantor waives any right to require [appellant] to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in [appellant's] power whatsoever."  Id.  The Court found that the guarantor waived the section 2845 and 2849 defenses.  Id.

Similarly, in <u>Wiener v. Van Winkle</u>, 273 Cal. App. 2d 774 (Cal. Ct. App. 2d Dist. 1969), the Court examined a guaranty which stated "[t]he [creditor] need not take any action against Debtor, any other guarantor, or any other person, firm or corporation or resort to any security held by it at any time before proceeding against the [guarantor]." <u>Id</u>. at 786–87 (internal quotations omitted).  The Court concluded the guarantors' rights under sections 2845 and 2849 were waived.  <u>Id</u>. at 787.  Notably, this guaranty did not contain the term "waiver," but the Court interpreted the language "as expressing an intention to waive any and all rights arising out of or incidental to the existence of the security."  <u>Id</u>. (internal quotations omitted).

Finally, in <u>Engelman v. Bookasta</u>, 264 Cal. App. 2d 915 (Cal. Ct. App. 2d Dist. 1968), the Court found a waiver of sections 2845 and 2849 where the guaranty stated:

> I hereby waive, for myself and for all other persons . . . (c) any
> right to require the holder of the within instrument to proceed
> against the maker or against any other person or to apply any
> security it may hold, or to proceed to first exhaust any security it
> may hold or to pursue any other remedy.

<u>Id</u>. at 916.

The language here stating the guarantors' obligations are independent of the debtor's obligations, <u>see</u> Guarantees § 2.4, is nearly identical to that found to constitute a waiver in <u>Guild Wineries & Distilleries</u>, 103 Cal. App. 3d at 973.  Moreover, section 2.4 of the Guarantees provides that a separate action may be brought against the guarantor whether an action is brought against the debtor and that the creditor need not exhaust security held by the debtor before seeking to collect from the guarantor—language found in each of the <u>Guild Wineries & Distilleries</u>, <u>Van Winkle</u>, and <u>Engelman</u> waivers.  While the <u>Guild Wineries & Distilleries</u> and <u>Engelman</u> guarantees also include the term "waive," "the inclusion of any particular language or phrases in the contract" is not required "to waive any rights and

defenses," Cal. Civ. Code § 2856(b).  Read as a whole, the language in section 2.4

expresses an intent to waive the rights provided by sections 2845 and 2949.

Despite Gary and Williams' contention, section 6 of the Guarantees does not alter this

conclusion.  However, section 6's inapplicability is not for the reason cited by LFG National at

oral argument.  "Suretyship" is defined as "[t]he legal relation that arises when one party

assumes liability for a debt, default, or other failing of a second party."  Black's Law

Dictionary, suretyship.  There is no reason why the section 2845 and 2849 defenses would

not constitute "suretyship defenses" as that term is used in section 6.  Instead, Gary and

Williams' argument fails because nothing in section 6 suggests that it contains an exhaustive

list of waived suretyship defenses.  To the contrary, section 6 provides that "Guarantor

waives any and all suretyship defenses, whether arising by contract, statute or by operation

of law."  Guarantees § 6.  That general waiver is followed by the statement, "[s]pecifically

Guarantor waives," and then five defenses are enumerated.  Id.  Nothing in section 6

indicates that the five enumerated defenses are the only suretyship defenses waived.  Thus,

section 6 does not preclude a finding that section 2.4 contains a valid waiver.

Accordingly, Gary and Williams waived the protections of California Civil Code

sections 2845 and 2849 by contract, and their motion to dismiss the second claim will be

denied.

### C.  Counter-defendants' Motion to Dismiss

### 1.  Counterclaims Related to Collection Activities

The first, second, and fifth counterclaims relate to counter-defendants' conduct in

attempting to collect sums owed to LFG National under the Loan Agreement.  As detailed

above, the parties do not dispute that LFG National sent letters to the following recipients:

(1) Sussman & Watkins, LLP, the Firm's local counsel in <u>Simpson</u>; (2) Boies, Schiller, & Flexner LLP, the Firm's co-counsel in <u>Pokorny</u>; and (3) New York State, the defendant in <u>Simpson</u>.  The Firm also contends counter-defendants impermissibly contacted Judge Conti regarding <u>Pokorny</u> and the Firm's clients.

Counter-defendants argue these three counterclaims must be dismissed because the Firm ignores the nature of LFG National's rights as a secured creditor of the Firm.  They contend the mailing of the Sussman, Boies, and Attorney General letters were expressly permitted by both the Loan Agreement and the Uniform Commercial Code ("UCC").  Furthermore, they argue the Firm failed to plead enough facts to support the fifth counterclaim for unfair business practices.  The Firm responds that it has sufficiently pleaded these counterclaims and that counter-defendants are merely attacking the facts and arguing their conduct does not rise to the level of a breach, an interference, or an unfair business practice, and that such determinations are not to be made at the motion to dismiss stage.

The Loan Agreement conveyed to LFG National a first lien security interest in most of the Firm's assets, including attorneys' fees.  Loan Agreement § 5.  Section 12 of the Loan Agreement entitled "Remedies," states that upon the occurrence of default, LFG National may "[t]ake or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon any Collateral."  <u>Id</u>. § 12.1, 12.1.3.  The parties also agreed in advance the standards for exercising remedies in the event of default.

Specifically, the Loan Agreement states:

> To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the

> Borrower acknowledges and agrees that <u>it is not commercially unreasonable for the Lender</u>:
>
> . . .
>
> to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of attorneys, collection agencies and other collection specialists[.]

<u>Id</u>. §§ 13, 13.2 (emphasis added).[6]  Section 13 also indicates its purpose:

> [T]o provide non-exhaustive indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section.

<u>Id</u>. § 13.9.  Finally, nothing contained in section 13 "shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 13."  <u>Id</u>. Thus, in addition to the above mentioned remedies, the Loan Agreement does not restrict those collection remedies provided for by the UCC.  The UCC provides that "[i]f so agreed, and in any event after default, a secured party . . . may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party."  U.C.C. § 9-607(a)(1) (amended 2010).

The Loan Agreement provides that it would not be commercially unreasonable for LFG National, in the event of default, to exercise remedies under the UCC including collection remedies against debtors and others obligated on collateral (i.e. people who owed the Firm

---

[6]  The Loan Agreement does not define "account debtors," but provides that all terms contained in the Loan Agreement that are not specifically defined shall have the meanings provided in the UCC.  Loan Agreement § 1.2.  The UCC defines "account debtor" as "a person obligated on an account, chattel paper, or general intangible."  U.C.C. § 9-102(3) (amended 2010).

legal fees).  It is undisputed that the Firm defaulted.  The Amendment dated May 29, 2009, specifically stated:

> Borrower acknowledges and agrees that:  (i) an Event of Default has occurred and is continuing under Section 11 of the Agreement because:  (i) Borrower has failed to make mandatory loan payments upon receipt of Eligible Case Costs recovered on any of Borrower's Cases . . . and (ii) certain other payments were made late in breach of the terms of the Agreement.

Amendment ¶ 1.  Therefore, counter-defendants' letters to account debtors—those people obligated to the Firm on collateral, such as Sussman & Watkins, LLP; Boies, Schiller, & Flexner LLP; and New York State—seeking to collect sums upon the Firm's default, were permitted under the terms of the Loan Agreement and the UCC.

### a. First Counterclaim:  Breach of Implied Covenant of Good Faith and Fair Dealing

This counterclaim alleges LFG National violated its duty to act fairly and in good faith by sending letters to "the Firm's co-counsel, opposing counsel and/or the Court in the Pokorny and the Simpson case."  Countercl. ¶ 33.  It further alleges LFG National acted in bad faith to declare a default under the Loan Agreement so that it could collect exorbitant amounts of default interest.  Id. ¶ 34.  Although not alleged in the counterclaim, the Firm also contends counter-defendants threatened to contact the Firm's clients.

"[E]very contract imposes upon each party to the contract a duty of good faith and fair dealing in the performance of the contract such that neither shall do anything that will destroy or injure the right of the other party to receive the benefits of the contract."  Seth Dallob Enters. v. Pomona Unified Sch. Dist., No. B197976, 2008 WL 2807230, at *5 (Cal. Ct. App. 2d Dist. July 22, 2008) (citing Waller v. Truck Ins. Exch., Inc., 900 P.2d 619, 639, 11 Cal. 4th 1, 36 (1995)).  However, an implied covenant of good faith and fair dealing cannot contradict

the express terms of a contract.  See Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 826 P.2d 710, 728, 2 Cal. 4th 342, 374 (1992) ("We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.").  Thus, "the implied covenant of good faith and fair dealing does not impose an affirmative duty on a party to refrain from enforcing rights expressly given under the contract."  Seth Dallob Enters., 2008 WL 2807230, at *5.

As previously explained, the Loan Agreement and UCC permit LFG National to exercise collection remedies against account debtors such as the Firm's co-counsel and opposing counsel, directly or through the use of attorneys.  Because the implied covenant of good faith and fair dealing does not require LFG National to refrain from exercising those rights expressly given to it under the Loan Agreement and the UCC, the Firm cannot sustain a counterclaim for breach of the implied covenant of good faith and fair dealing based on the Sussman, Boies, and Attorney General Letters.

The Firm fares no better with respect to counter-defendants' alleged communications with Judge Conti.  Although the veracity of well-pleaded factual allegations must be assumed for purposes of a motion to dismiss, the Firm's bare allegation that letters were sent to "co-counsel, opposing counsel and/or the Court" is hardly a well-pleaded factual allegation.  Countercl. ¶¶ 33, 41 (emphasis added).  Moreover, the Boies letter stated:  "Be advised that LFG intends to advise Judge Conti on Monday that LFG possesses a first lien security interest over all sums due to the Firm."  Boies letter (emphasis added).  The Firm has not referenced or attached any correspondence between LFG National or LFG Servicing and Judge Conti.  Counter-defendants insist they never communicated with Judge Conti regarding the Firm or any debt owed by the Firm.  See Zimmerman Decl., Oct. 7, 2011,

¶¶ 3–4, Dkt. No. 58-1.  In light of the Firm's conclusory allegation and the actual language of the Boies letter, it has not raised its right to relief above a speculative level.  The alleged communications with Judge Conti cannot support a cause of action.

Likewise, even if the Firm pleaded that counter-defendants threatened to, or did contact the Firm's clients, such conclusory allegations would not withstand a motion to dismiss.  The Firm has not alleged that LFG National or LFG Servicing actually mailed CEO Zimmerman's pre-drafted letters to the Firm's clients.  To the contrary, the plain language of the Zimmerman letter indicates CEO Zimmerman requested the Firm mail the letters to its clients.  The Firm cannot maintain a cause of action for breach of the implied covenant of good faith and fair dealing based on alleged communications with the Firm's clients.

Accordingly, counter-defendants' motion to dismiss will be granted and the first counterclaim will be dismissed.

### b.  Second Counterclaim:  Interference with Contractual Relations

This counterclaim arises from the same facts as the first counterclaim and involves the Sussman, Boies, and Attorney General letters and the alleged communications with Judge Conti and the Firm's clients.  It alleges the Firm "entered into a written legal service agreement with its clients and a contractual co-counsel agreement in the Pokorny case and the Simpson case" and that counter-defendants "had knowledge of the Firm's financial statements for its pending cases, as well as the identity of its co-counsel."  Countercl. ¶¶ 39, 40.  The Firm contends counter-defendants sent the letters to intentionally interfere with the contractual relations between the Firm and its clients, and the Firm and its co-counsel.  Id. ¶ 41.  The counterclaim alleges the letters were sent in bad faith and that LFG National's motive was to sabotage the potential settlements in Pokorny and Simpson so that the Firm

would default under the Loan Agreement and LFG National could collect exorbitant amounts of default interest.  Id. ¶ 42.  Finally, the counterclaim asserts "LFG National and LFG Servicing have attempted to interfere with the Firm's fiduciary duties to its clients."  Id. ¶ 45.

The elements of an action for tortious interference with contract are "'(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'"  Hahn v. Diaz-Barba, 194 Cal. App. 4th 1177, 1196 (Cal. Ct. App. 4th Dist. 2011) (quoting Quelimane Co. v. Stewart Title Guaranty Co., 960 P.2d 513, 530, 19 Cal. 4th 26, 55 (1998)).

The Firm has sufficiently alleged the first two elements, namely that it had written agreements with clients and co-counsel and that counter-defendants were aware of those agreements.  With respect to the third element, the Firm must plead the facts of interference, "such as [counter-]defendants' advising, counseling, or persuading the third party to terminate the contract."  Bent v. Rivergate Commons, No. C049917, 2006 WL 3531425, at *7 (Cal. Ct. App. 3d Dist. Dec. 8, 2006).  There are no allegations that LFG National or LFG Servicing advised, counseled, or persuaded the Firm's co-counsel, opposing counsel, clients, or Judge Conti to terminate their contractual relations with the Firm.  Nor do the Sussman, Boies, or Attorney General letters advise such.  The Firm has not alleged facts to show LFG National and LFG Servicing engaged in intentional acts designed to induce a breach or disruption of the Firm's contractual relationships.  The Firm must plead the interference was wrongful "'by some measure beyond the fact of the interference itself.'"  Id. (quoting Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 751, 11 Cal. 4th 376, 393 (1995)).

Instead, counter-defendants' admitted motive in sending the letters was to collect on the debt owed to them by the Firm.  The Firm's contention that LFG National actually intended to sabotage payments owed to the Firm so it could declare a default under the Loan Agreement is implausible.

As to the fourth and fifth elements, the Firm has failed to allege other than in a conclusory manner, that counter-defendants' mailing of the Sussman, Boies, and Attorney General letters caused the breach or actual disruption of any contractual relationship.  The counterclaim alleges the "acts <u>may</u> have jeopardized the potential recovery of the Firm and the Firm's clients" and "hindered the Firm's performance under its agreements with its clients and co-counsel."  Countercl. ¶¶ 43, 44 (emphasis added).  Mere speculation that the alleged conduct breached or disrupted the Firm's contractual relationships and that damages may result are insufficient to survive a motion to dismiss.  Finally, as previously explained, the alleged communications with Judge Conti and the Firm's clients are baseless and insufficient to sustain a claim.

Therefore counter-defendants' motion to dismiss will be granted and the second counterclaim will be dismissed.

### c. <u>Fifth Counterclaim</u>:  <u>Unfair Business Practices</u>

This counterclaim alleges LFG National, LFG Servicing, and LawFinance engaged in conduct in violation of California Business and Professions Code section 17200.  Specifically, the counterclaim cites information on LawFinance's website; LFG National and LFG Servicing's collection efforts; and the terms of the Loan Agreement.  <u>See</u> Countercl. ¶¶ 63–71.  The Firm alleges counter-defendants acted unlawfully, unfairly, and engaged in fraudulent business practices and false advertising.  <u>Id</u>.

California Business and Professions Code section 17200, known as the unfair competition law ("UCL"), prohibits business practices which are unlawful, unfair, or fraudulent.  Cal. Bus. & Prof. Code § 17200 (West 2012).  The statute "is written in the disjunctive, establishing three varieties of unfair competition."  Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1043 (9th Cir. 2010) (internal quotations omitted).

### i. "Unlawful" Prong

Regarding "unlawful" claims, section 17200 "borrows violations from other laws by making them independently actionable as unfair competitive practices."  Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943, 29 Cal. 4th 1134, 1143 (2003) (internal quotations omitted).  To plead a claim based on unlawful activity, a party must identify some other law and "state with reasonable particularity the facts supporting the statutory elements" of the alleged violation.  Stearns v. Select Comfort Retail Corp., 763 F. Supp. 2d 1128, 1150 (N.D. Cal. 2010) (internal quotations omitted).

Here, the counterclaim alleges the interest rates in the Loan Agreement are usurious and violate Florida and California law.  Countercl. ¶¶ 68–69.  The Firm further alleges "terms in the Agreement relating to the compounding of interest, waiver and jurisdiction are unconscionable under California and/or Florida law." Id. ¶ 70.  As explained below in section two, the interest rates do not violate Florida or California law; therefore the Firm cannot plead a claim for an unlawful business practice based on these facts.  With respect to the compounding of interest, waiver, and jurisdiction, the counterclaim does not identify which laws the loan terms allegedly violate, thus the Firm has not "state[d] with reasonable particularity the facts supporting the statutory elements" of the alleged violation.  Stearns,

763 F. Supp. 2d at 1150.  Accordingly, any claims of unlawful business practices based on terms in the Loan Agreement must be dismissed.

### ii.  "Unfair" Prong

The state of the law on what constitutes an "unfair" business practice in consumer actions under the UCL is somewhat unsettled.[7]  Neither the Ninth Circuit nor the California Supreme Court have endorsed the test articulated in Camacho v. Automobile Club of Southern California, but it is the test used by the majority of federal and state trial courts in California.  See e.g., Kilgore v. Keybank, Nat'l Ass'n, 712 F. Supp. 2d 939, 951–52 (N.D. Cal. 2010) vacated on other grounds, appeal dismissed by, 673 F.3d 947 (9th Cir. 2012); Davis v. Ford Motor Credit Co., 179 Cal. App. 4th 581, 596–98 (Cal. Ct. App. 2d Dist. 2009).  Under Camacho, the elements of an unfair act or practice claim are:  "(1) a substantial consumer injury; (2) the injury outweighs any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided."  See Peel v. BrooksAmerica Mortg. Corp., 788 F. Supp. 2d 1149, 1165 (C.D. Cal. 2011).

The counterclaim alleges LFG National and LFG Servicing engaged in unfair business practices by virtue of their overly aggressive and harassing collection efforts.  Countercl. ¶¶ 64–67.  With respect to the first element, at best the Firm alleges its clients' potential recovery has been jeopardized and its fiduciary duties to its clients have been interfered with.

---

[7]  In 1999 the California Supreme Court devised a "precise test" for unfairness, to avoid reliance on "purely subjective notions of fairness."  Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tele. Co., 973 P.2d 527, 564, 20 Cal. 4th 163, 184–85 (1999).  However in a footnote, the Court limited the test to actions "by a competitor alleging anticompetitive practices," and thus left for another day whether the test applies to consumer cases as well.  Id. at 565 n.12, 20 Cal. 4th at 187 n.12.  Cel-Tech was followed by a long line of cases disputing whether the new definition of "unfair" did in fact apply to consumer cases.  To resolve the conflict, one California appellate court looked to section 5 of the Federal Trade Commission Act to create a new three-factor test for determining unfairness in consumer actions.  Camacho v. Auto. Club of So. Cal., 142 Cal. App. 4th 1394, 1403 (Cal. Ct. App. 2d Dist. 2006).

Assuming those facts constitute a substantial consumer injury, the Firm fails to plead that the alleged injury outweighs any countervailing benefit to consumers or competition, or that the alleged injury could not reasonably have been avoided.  In the absence of facts supporting the second and third elements, the Firm has not raised its right to relief above a speculative level and this claim must be dismissed.

### iii.  **"Fraudulent" Prong**

To state a claim under the "fraudulent" prong based on false advertising, "it is necessary only to show that members of the public are likely to be deceived."  In re Tobacco II Cases, 207 P.3d 20, 29, 46 Cal. 4th 298, 312 (2009) (internal quotations omitted).  Although fraud is not an essential element of a section 17200 claim, "allegations of fraudulent conduct must nevertheless satisfy the heightened pleading requirements of [Federal] Rule [of Civil Procedure] 9(b)."  Claridge v. RockYou, Inc., 785 F. Supp. 2d 855, 862 (N.D. Cal. 2011) (citing Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1103–05 (9th Cir. 2003) (finding the heightened pleading standards of Rule 9(b) apply to allegations of fraud and allegations that sound in fraud, including false misrepresentations)).

Here, the counterclaim alleges "LawFinance advertises on the Ethics and Law page of its website that it does not offer legal advice, assume control of the case, or interfere in the attorney-client relationship.  All details of the case are held in strictest confidence.  At no time does LawFinance Group interfere in the handling of the case."  Countercl. ¶ 63 (internal quotations omitted).  Despite this representation, the Firm contends LFG National and LFG Servicing sent the Sussman, Boies, and Attorney General letters to intentionally interfere with the Firm's contractual relationships with its clients and co-counsel.  Id.  Thus, counter-

defendants falsely advertised that they would not interfere with the attorney client relationship, but did so anyway.

Any claim based upon fraudulent business practices or false advertising must fail. The Firm has not alleged that members of the public are likely to be deceived. Nor can the Firm demonstrate that it (or its attorneys) were likely to be deceived into believing LawFinance and/or LFG Servicing would not engage in collection efforts, particularly since the Loan Agreement permitted collection efforts upon the Firm's default. Accordingly, the Firm cannot maintain a claim under the "fraudulent" prong.

Because the Firm cannot sustain a cause of action under any of the three varieties of unfair competition provided for by section 17200, counter-defendants' motion to dismiss will be granted and the fifth counterclaim will be dismissed.

### 2. Counterclaims Related to Interest Rate

The third and fourth counterclaims relate to the loan's interest rate. The interest rate under the Loan Agreement was originally the Index plus 13% per annum, and the default rate was the interest rate plus 5% per annum. Loan Agreement §§ 1.2.24, 1.2.16. Assuming the loan was not paid in full by the end of 2009, the Amendment provided for a 16% interest rate, rendering the default interest rate to be 21%. Amendment ¶ 1.

### a. Third Counterclaim:  Violation of Florida Usury Law

In reply, the Firm agrees to voluntarily dismiss this claim.

### b. Fourth Counterclaim:  Violation of California Usury Law

This counterclaim alleges the Loan Agreement violates California usury law. The Firm contends the Loan Agreement became usurious when LawFinance assigned its interests to LFG National, an out-of-state company, who later increased the interest rates.

Usury is defined as the charging of interest in excess of that allowed by law.  See e.g., Junkin v. Golden West Foreclosure Serv., Inc.,180 Cal. App. 4th 1150, 1155 (Cal. Ct. App. 1st Dist. 2010).  The basic usury laws in California are found in Article XV of the California Constitution.  Generally, a lender cannot charge more than 10% interest per year, unless an exemption applies.  See Cal. Const. art. XV, § 1.  None of the usury law's restrictions apply to "persons authorized by statute, or to any successor in interest to any loan or forbearance exempted under this article."  Id. (emphasis added).  The California Finance Lenders Law exempts California commercial lenders from the constitutional restrictions on interest.  Cal. Fin. Code § 22002 (West 2012).

The parties agree the Loan Agreement was not usurious when made because LawFinance is a California licensed lender and thus exempt from the usury laws.  Article XV, Section 1 of the California Constitution states that such exemptions shall apply to successors in interest to a loan, such as LFG National.  To conclude otherwise would contravene the purpose behind the exemption; the Firm's argument "would in effect prohibit—make uneconomic—the assignment or sale by banks of their commercial property to a secondary market.  This would be disastrous in terms of bank operations and not conformable to the public policy exempting banks in the first instance."  Strike v. Trans-West Discount Corp., 92 Cal. App. 3d 735, 745 (Cal. Ct. App. 4th Dist. 1979); see also 8 Cal. Real Est. (Miller & Starr) 21:33 (3d ed. 2003) ("The purpose of the exemption is to foster the free transferability of loans in the marketplace, and, if the exemption did not pass with the assignment, there would be serious consequences to lending institutions who might be prevented from selling their loans in the secondary market.").  Thus, the assignment by LawFinance to LFG National, a

Delaware limited liability company with its principal place of business in Nevada, did not render the loan usurious.

The Firm attempts to distinguish <u>Strike</u>, 92 Cal. App. 3d at 745, because the interest rate in that case remained the same upon assignment, whereas here, LFG National and the Firm later negotiated a higher interest rate post-assignment.  However, the Firm has cited no authority indicating that an increase in the interest rate, due to the borrower's default, immediately renders an otherwise lawful loan usurious.  To the contrary, case law indicates such action is entirely proper.

In <u>Bobby D. Associates v. McDonald</u>, 2004 WL 831179, No. B164609 (Cal. Ct. App. 2d Dist. Apr. 19, 2004), borrower John McDonald entered into a loan agreement with United Mercantile Bank & Trust ("Mercantile"), a California licensed lender.  2004 WL 831179, at *1. The loan provided for 12% interest which was lawful because Mercantile was exempt from California usury laws.  <u>Id</u>.  Mercantile subsequently assigned its interests in the loan to Bobby D. Associates, a non-California licensed lender, and at some point the interest rate increased to 12.5%.  <u>Id</u>. at *1, 3.  The borrower made arguments similar to the Firm's contentions here. <u>Id</u>. at *3.  The Court held that "as respondent [Bobby D. Associates] was United Mercantile's successor in interest, the exemption extended to it, too."  <u>Id</u>. (citing <u>Strike</u>, 92 Cal. App. 3d at 745).  The Court rejected the borrower's argument that "usury laws apply to a successor in interest who changes the rate" and rebuffed the borrower's attempt to distinguish the facts from <u>Strike</u>.  <u>Id</u>.

Further, it is well-established that "a debtor by voluntary act cannot render an otherwise valid transaction usurious."  <u>Sw. Concrete Prods. v. Gosh Constr. Corp.</u>, 798 P.2d 1247, 1250, 51 Cal. 3d 701, 706 (1990).  "'A debtor cannot bring his creditor to the penalties

of the Usury Law by his voluntary default in respect to the obligation involved where no violation of law is present at the inception of the contract.'" Id. (quoting Sharp v. Mortg. Sec. Corp., 9 P.2d 819, 820, 215 Cal. 287, 291 (1932)).

Finally, the Firm takes issue with the timing of the assignment. While the Firm implies impropriety with the fact that the assignment was made only three days after the Loan Agreement was executed, it has pointed to no case law suggesting this practice is illegal or even questionable.

The Loan Agreement was not usurious when executed with LawFinance, an exempt lender. The transfer of the Loan Agreement to LFG National did not render it usurious because exemptions to the usury laws apply to successors in interest to a loan. Moreover, the Amendment modified the interest rate as consideration for LFG National's waiver of the Firm's defaults. The Firm cannot bring LFG National to the penalties of the usury law by its voluntary default.

Accordingly, the Loan Agreement does not violate California usury law. Counter-defendants' motion to dismiss will be granted and the fourth counterclaim will be dismissed.

## IV.  CONCLUSION

Gary and Williams waived the protections of California Civil Code sections 2845 and 2849 by contract. LFG National is not required to first proceed against the Firm nor exhaust the Firm's collateral before proceeding against guarantors Gary and Williams. Accordingly, Gary and Williams' motion to dismiss plaintiff's second claim will be denied.

The Firm's first counterclaim will be dismissed because the implied covenant of good faith and fair dealing cannot prohibit counter-defendants from doing what is expressly permitted under the terms of the Loan Agreement. The second and fifth counterclaims will

also be dismissed because the Firm has failed to plead facts demonstrating it is entitled to relief on either an interference with contractual relations or unfair business practices cause of action.  Finally, the Firm voluntarily dismisses the third counterclaim and the fourth counterclaim will be dismissed because the Loan Agreement does not violate California usury law.

Therefore, it is

ORDERED that

1.  Defendants Willie Gary and Lorenzo Williams' motion to dismiss the Second Claim (Breach of Guarantees) is DENIED;

2.  The Third Counterclaim (Violation of Florida Usury Law) is voluntarily DISMISSED; and

3.  Counter-defendants LFG National Capital, LLC; LawFinance Group, Inc.; and LFG Servicing, LLC's motion to dismiss the remaining counterclaims is GRANTED, and the following counterclaims are DISMISSED:

(a)  First Counterclaim (Breach of the Implied Covenant of Good Faith and Fair Dealing);

(b)  Second Counterclaim (Interference with Contractual Relations);

(c)  Fourth Counterclaim (Violation of California Usury Law); and

(d)  Fifth Counterclaim (Unfair Business Practices).[8]

IT IS SO ORDERED.

---

[8]  In view of the fact that all counterclaims have been dismissed, the caption need no longer reflect Gary, Williams, Finney, Lewis, Watson, and Sperando P.L. as counter-claimant nor LFG National Capital, LLC; LawFinance Group, Inc.; and LFG Servicing, LLC as counter-defendants.

United States District Judge

Dated:  July 12, 2012
        Utica, New York.